FRANK E. MAYER, complainant,

*v.*

OXIDATION PRODUCTS COMPANY, INCORPORATED, et al., defendants.

[Decided March 2d, 1932.]

*Messrs. Pitney, Hardin & Skinner,* for the complainant.

*Messrs. Wall, Haight, Carey .& Hartpence,* for the defendants.

BIGELOW, V. C.

Complainant is a stockholder of the Oxidation Products Company and the Industrial Oxidation Corporation, both incorporated in Delaware. The two companies have the same stockholders, directors and officers, and are operated

as a single enterprise. Complainant alleges that three of the stockholders, namely, Fischer, Bibb and Van Pelt, have received large sums belonging to the corporations and he asks an accounting and restoration to the companies. Similarly, he asserts that moneys of the companies have been improperly paid to a third corporation, Grant Manufacturing Company, controlled by Fischer and Van Pelt, and prays accounting and restoration from it. He also alleges that the oxidation companies have agreed to purchase from Van Pelt his holdings in their stock, at an excessive price, and that the purchase will impair their capital. He prays that the contract be canceled. Fischer, Bibb and Van Pelt held a large majority of the stock of the companies and were a majority of the boards of directors when the agreement to buy Van Pelt's stock was made. Van Pelt then resigned but the other two continued on the boards and dominate the companies' affairs. Other statements in the bill and prayers for relief need not now be recited. The case is before the court on an order to show cause why any payments by the companies to the three individual defendants should not be restrained *pendente lite*.

At the outset, complainant is met with the contention that the litigation is beyond the jurisdiction of this court, because it relates to the internal affairs of foreign corporations and because it calls for an exercise of visitorial powers. Visitorial powers is a term often used with no attempt to define its meaning. The student will find much information on visitation in *MacKenzie* v. *Trustees of the Presbytery of Jersey City*, 67 N. J. Eq. 652, 678; *Philips* v. *Bury*, 2 T. R. 346; 100 Eng. Rep. 186; *Green* v. *Rutherforth*, 1 Ves. 462; 27 Eng. Rep. 1144; *King* v. *Bishop of Ely*, 1 Bl. R. 71; 96 Eng. Rep. 39; *Harkness* v. *Guthrie* (*Utah*), 75 Pac. Rep. 624; 107 A. S. R. 664; 199 U. S. 148, 157; *Murdock's Case*, 24 Mass. 303; *Sanderson* v. *White*, 35 Mass. 328; the opinion of Mr. Justice Story in the *Dartmouth College Case*, 17 U. S. 518, 673; *Attorney-General* v. *Utica Insurance Co.*, 2 Johns. Ch. 371; *Com. Dig. tit. "Visitor;"* 1 Bl. Com. 480; 7 R. C. L. 610; 7 Am. & Eng. Encycl. L. 857; 14a C. J. 341.

Forms of visitors' commissions and instructions may be found in Burnet's History of the Reformation.

The concept of visitorial (or visitatorial) power was derived from the canon law and was extensively applied in the eighteenth century as a part of the common law, to charitable corporations, and especially to colleges. As so applied, visi-x torial power may be defined as the exclusive right of the founder of a corporation, his heirs or nominees, to make by-laws for the corporation and to adjudge disputes arising thereunder. The original endower of the corporation was considered to be the founder. If the king endowed, he was the founder and had the right of visitation, which he exercised through the chancellor as his visitor. But this authority of the chancellor was not a part of the jurisdiction which he exercised in the court of chancery; it was one of his ministerial powers. *3 Bl. Com. 47; Attorney-General* v. *Earl of Clarendon, 17 Ves. Jr. 491; 34 Eng. Rep. 190.* The visitor was not the proper judge in all disputes among members of the corporation or relating to its internal affairs, but only in cases arising under its by-laws; controversies under the general law of the land were adjudicated in the public courts. Thus in *King* v. *St. John's College, 4 Mod. 233; 87 Eng. Rep. 366, mandamus* issued out of the king's bench to compel the master of the college to take the oath of the fellows. In *Attorney-General* v. *Corporation of Bedford, 2 Ves. 505; 28 Eng. Rep. 323.* Lord Hardwicke made the master of the school account for school funds, although he declined to remove him, since removal came within the power of the visitor. In the early days when a charity was created, the beneficiaries usually composed the corporation, for example the master and fellows of a college; but during the last two centuries the custom has arisen of incorporating trustees, who do not personally share in the revenue. In such case, by implication, the trustees are the visitors. Now, I much doubt if any of this doctrine has ever been the law in our country. The private endower of an incorporated charity has no visitorial power; the state seems to have the same power in respect to corporations endowed privately and

those endowed by the state, except as its power in respect to the former may be restricted by the doctrine of the *Dartmouth College Case.* The authority of trustees is determined by the charter of the corporation or by the law of trusts and not by any rule concerning visitors.

Blackstone says that corporations other than charitable, namely, municipalities, trading companies, &c., were subject to the visitation of the king in the court of king's bench according to the rules of the common law. And in our country it has been laid down that the legislature is visitor of all corporations. I confess that this has, for me, little meaning; I have found no decision of which I could say that it was a case of the exercise of visitorial power over a civil corporation. Of course, the king's bench and, in New Jersey, the supreme court, by the prerogative writs compel the performance of corporate duties, decide disputes over offices, and review ordinances. But these writs do not depend on a visitation; they issue pursuant to the court's jurisdiction over franchises, subordinate tribunals and public officers. Similarly, the legislature enacts statutes concerning corporations, but of what act can it be said that the authority of the legislature to pass it depended on visitorial power? Now, I realize that the power of the legislature to enact a given statute may fall under more than one heading. While all our statutes can stand, I believe, without recourse to visitorial power, still it may be that some of them have added authority from that source. Possibly the sections of the Corporation act relating to reeiverships of domestic corporations (*Comp. Stat. p. 1640*) find sanction in visitorial power. If so, then the jurisdiction of chancery bestowed by those sections may depend on that right of visitation which inheres in the founder of a corporation. But outside such, or similar statutory authority, the court of chancery has no visitorial power over any corporation. Such power (if any there be) is in the supreme court.

Stockholders' suits in equity have been so common of late years that the court ordinarily finds no need to state the basis of jurisdiction. But an examination of the cases,

especially the earlier ones, discloses that the jurisdiction of ✗ the court of chancery in the usual suit between a stockholder and his corporation, is not dependent upon any visitorial power, but is a part of the general equity jurisdiction of the court. In one group of decisions, relief is founded on the premise that a corporate charter is a contract between the corporation and its stockholders, and between the stockholders severally, whereby it is agreed that the corporate property will be employed for a specified purpose. A court of equity, at the suit of a stockholder, one of the contracting parties, will restrain a violation of the contract. Cases of this character are *Kean* v. *Johnson, 9 N. J. Eq. 401; Zabriskie* v. *Hackensack and New York Railroad Co., 18 N. J. Eq. 178; Black* v. *Delaware and Raritan Canal Co., 24 N. J. Eq. 455; McGregor* v. *Home Insurance Co., 33 N. J. Eq. 181; Elkins* v. *Camden and Atlantic Railroad, 36 N. J. Eq. 5; Pronick* v. *Spirits Distributing Co., 58 N. J. Eq. 97; Colgate* v. *United States Leather Co., 73 N. J. Eq. 72; reversed, 75 N. J. Eq. 229.* Such suits fall within the court's jurisdiction to enforce a contract where the legal remedy for a breach is inadequate. Other decisions put emphasis on trusts and frauds. The directors are trustees for the corporation and for the stockholders, a stockholder, as a *cestui que trust,* may appeal to the court to prevent a breach of trust by his trustees, the directors, or to make them account for past derelictions. *Gardner* v. *Butler, 30 N. J. Eq. 702; Ackerman* v. *Halsey, 37 N. J. Eq. 356; Freeman* v. *Sea View Hotel Co., 57 N. J. Eq. 68; Way* v. *American Grease Co., 60 N. J. Eq. 263.*

These two classes of cases—contract and trust—frequently merge into each other, since a diversion by the directors of the capital of the corporation from the ends prescribed by the charter may be viewed as a breach of either the contract or of the trust. The jurisdiction is summed up in *Johnston* v. *Jones, 23 N. J. Eq. 216, 225,* "to enforce trusts, suppress frauds, and compel the performance of contracts, are peculiarly the province of a court of equity. These ends may be attained by means of injunction or decree for specific per-

formance, or both. If the subject-matter is within the jurisdiction of the court, its powers and process will be used so as to effect the object to be attained."

Viewed from this angle, the power of chancery to entertain a stockholder's bill is not determined by the character of the corporation, domestic or foreign. It matters not where the contract or the trust was created, which the court is asked to enforce, or where the fraud was concocted, which the court is prayed to suppress. A court of equity proceeds *in personam* against wrong-doers found within its jurisdiction. The subject has been elaborately considered in connection with contracts and frauds respecting property outside the jurisdiction. *Penn* v. *Lord Baltimore, 2 White & T. 923, and notes; Lindley* v. *O'Reilly, 50 N. J. Law 636.*

While an actual or threatened misuse of corporate assets may be treated as an injury to the individual stockholders as beneficiaries of a trust, or parties to a contract, still the cause of action arising therefrom belongs primarily to the corporation itself. And this is so whether the defendants are strangers to the corporation or are officers or directors acting under color of authority vested in them by the corporation and whether they act fraudulently or in good faith. The stockholder who files the bill in such a case, acts in a representative capacity; he asserts a right which belongs primarily to the corporation. *Brown* v. *VanDyke, 8 N. J. Eq. 795; Elkins* v. *Camden and Atlantic Railroad Co., 36 N. J. Eq. 5, 15,* and *Ackerman* v. *Halsey, supra.* Even a suit to compel the directors to declare dividends has been said to be primarily a suit in behalf of the corporation. *Laurel Springs Land Co.* v. *Fougeray, 50 N. J. Eq. 756.* A stockholder may maintain a suit not only to prevent wrongful acts by the managers of his corporation, but to restrain injuries threatened by a third party in case the managers of the corporation refuse to act. *Gifford* v. *New Jersey Railroad and Transportation Co., 10 N. J. Eq. 171,* is an example. The standing of a stockholder to maintain a suit for the protection of the corporate property is not a pecularity of corporation law, but rather a branch of the rule that a *cestui*

*que trust* may sue in behalf of the trust estate when the trustee refuses or is unable to maintain the action. *LeGendre* v. *Goodridge, 46 N. J. Eq. 419; 48 N. J. Eq. 308; 23 Atl. Rep. 581.*

In these suits brought by a stockholder in behalf of the corporation, it is necessarily implied that the actions complained of are hostile to the corporation. This applies equally to suits against directors charged with a willful breach of trust, and to cases where complainant seeks to enforce the charter as a contract and to restrain a violation thereof approved in good faith by a majority of the stockholders. The corporation's cause of action asserted by the stockholder, must be founded on the notion that the diversion of the corporate assets from the purposes for which the corporation was formed, is inimical to the corporation. It is a mistake to regard such suits as an interference with the internal affairs of the corporation. True, the court must ordinarily look into the proceedings of the directors and stockholders, and frequently enjoins action under color of authority of corporate resolutions. But the fundamental inquiry is whether the acts, committed or threatened, are indeed the acts of the corporation or are they acts of individuals who happen to have control of the corporate affairs.

The suit now before the court is brought by a stockholder in behalf of the corporation. It may be contrasted with actions brought to establish membership in a corporation, or title to a corporate office, or to obtain leave to examine the corporate records, or the like. With the question of jurisdiction over such actions, I am not presently concerned. Nor am I investigating the distinction, noted by Vice-Chancellor Green in *Willoughby* v. *Chicago Junction Railways and United Stockyards Co., 50 N. J. Eq. 656,* between a suit in behalf of the corporation and a suit by a stockholder, to enforce his own equitable rights as a stockholder; the present suit is clearly brought in the right of the corporation.

Our New Jersey equity reports do not contain many decisions in suits brought by stockholders on behalf of foreign corporations; the practice of obtaining a charter in one

state, with a purpose of doing business in another, is comparatively new. The change which has taken place is indicated by *Hill* v. *Beach, 12 N. J. Eq. 31,* decided in 1858. Defendants had incorporated in New York in order to operate a quarry in New Jersey. Chancellor Williamson held that the incorporation was a fraud on the New York statute, and that the stockholders might be sued here as partners. Three years earlier the supreme court had found necessary to consider with care whether a corporation could be sued in a foreign jurisdiction. *Moulin* v. *Trenton Mutual Life and Fire Insurance Co., 25 N. J. Law 57.* In 1873, the legislature, reciting that "doubts have arisen as to whether foreign corporations can hold, mortgage and convey lands in this state," enacted that it should be lawful for them to do so. The same statute made foreign corporations doing business and holding lands in this state subject to the general corporation acts of New Jersey, so far as the same were applicable. *P. L. 1873 p. 76.*

The earliest suit in chancery of New Jersey by a stockholder of a foreign corporation in its behalf which I have found, is *Gregory* v. *New York, Lake Erie and Western Railroad Co., 40 N. J. Eq. 38.* The controversy was between complainant's corporation and the New York, Lake Erie and Western Railroad Company and related to lands in Pennsylvania as well as to shares of stock in the former company held by the latter, alleged to have been illegally and fraudulently issued. Chancellor Runyon cited *Howell* v. *Chicago and North Western Railway Co., 51 Barb. 378,* and *Cumberland Coal and Iron Co.* v. *Hoffman Steam Coal Co., 30 Barb. 159,* in which the supreme court of New York had said that while it did not hold that in no case should the courts of that state exercise jurisdiction in reference to the affairs of foreign corporations, yet to warrant the exercise of the jurisdiction, there must be either a necessity or a fitness suggested by the peculiar circumstances. The chancellor concluded: "In the case in hand, the courts of New York are the proper forum, for this litigation and this court ought to decline to exercise jurisdiction." The opinion does not indicate that chancery was without jurisdiction.

The next suit reported is *Wilson* v. *American Palace Car Co., 64 N. J. Eq. 534.* The bill was filed by a stockholder of a Maine corporation to set aside a transfer of its assets. The transfer was alleged to be a fraud upon the company although approved by a majority of its stockholders. Vice-Chancellor Emory said: "In these cases of representative rights, the company represented, although made formally a defendant, is strictly and properly the real complainant and in matter of form, could properly be made complainant. This is the usual practice in England. *Duckett* v. *Gover (Jessel M. R. 1887), 6 Ch. Div. 82, 85.* If the company applies to strike out its name as complainant, the court will allow it to be made a defendant. In this country, the company represented is usually made defendant in the first instance, where the defendants or officers, whose dealings on behalf of the company are attacked, also control the company's action or defense. * * * But as the decree in the cause, if it should finally go for complainant, would be a decree in favor of the Maine company, I consider that company as now substantially the complainant in the suit and that its plea to the jurisdiction cannot be sustained except upon the theory that, as against New Jersey defendants, whether individual or corporate, the stockholders of a foreign corporation cannot prosecute the company's rights in any case without the consent of those who, for the time being, control the company's formal appearance and defense. This would lead to great inequity and injustice, and I am not willing to adopt such a rule." On demurrer, he overruled the plea to the jurisdiction. From this order, an appeal was taken. *65 N. J. Eq. 730.* It appeared from the plea that process had not been served upon the company (and two other defendants). The court of errors and appeals held that the suit was *in personam* and that the company had not been brought before the court by due process of law and therefore should be dismissed as a defendant. This case next came before Vice-Chancellor Reed who denied a motion to dismiss the bill because of the absence of necessary parties. *67 N. J. Eq. 262.* I think that if the court of errors and appeals had

doubted the jurisdiction of chancery over the subject-matter of. the suit, that doubt would have been expressed in its opinion and the court of chancery would not have been left to proceed with the cause.

In *Lillard* v. *Oil, Paint and Drug Co., 70 N. J. Eq. 197*, Vice-Chancellor Emery considered the reasonableness of salaries paid by three companies, one of which was incorporated in West Virginia. Without discussing the question of jurisdiction, he handled the case as if only domestic corporations were involved.

*Steitz* v. *Old Dominion Copper Mining and Smelting Co., 89 N. J. Eq. 265,* was a bill by a stockholder of a New York company. It is alleged that the company had confessed judgment and later had sold all its property to one of the judgment creditors in order to satisfy the judgment. The bill sought a rescission or an accounting. Defendants moved that the bill be dismissed because the court should not undertake an investigation of this kind into the affairs and relations of foreign corporations at the suit of a non-resident as to property not within the state. Vice-Chancellor Lewis overruled the objection: "The matters involved in the bill are not internal affairs of a corporation but are matters based on allegations of fraud committed by officers and directors of a corporation against the stockholders thereof."

*Eckrode* v. *Endurance Tire and Rubber Corp., 90 N. J. Eq. 129; affirmed, 91 N. J. Eq. 153.* Complainant was a stockholder of a New York company doing business in this state. He prayed that a sale of the company's assets in this state be declared void on the ground that it had not been approved by the stockholders as required by the corporation law of New York. The defendants contended that the court was without jurisdiction as the controversy was between a stockholder and the corporation and its directors and related to the internal affairs of a foreign corporation. The court (Vice-Chancellor Foster), on the authority of *Gregory* v. *New York, Lake Erie and Western Railroad Co., supra; Jackson* v. *Hooper,* noticed below, and *Atwater* v. *Baskerville, 89 N. J. Eq. 121; 90 N. J. Eq. 275,* dismissed the bill.

The question considered in the last cited case, was the power to appoint a receiver of a foreign corporation. Vice-Chancellor Lane said: "The law seems to be well settled that a court of equity has jurisdiction under its inherent power and where statutes exist similar to that in this state, then under such statutes, to appoint a receiver of a foreign corporation, upon the ground of .insolvency or upon any other ground which would warrant the appointment of a receiver to conserve and gather in the assets, either legal or equitable, within the state, and to enforce the rights of the corporation, either legal or equitable, which may be enforced against those over whom jurisdiction may be obtained, within ·the case of *Pennoyer* v. *Neff, 95 U. S. 714; 24 L. Ed. 565.* * * * The question is not one of jurisdiction but of discretion in the exercise of jurisdiction." Vice-Chancellor Foster concluded that the facts before him in the *Eckrode Case* were not "sufficient to justify this court in assuming jurisdiction." I take it that he did not mean that the court had no jurisdiction but rather than in the exercise of a sound discretion, relief should be denied.

*Busch* v. *Mary A. Riddle Co., 92 N. J. Eq. 166.* The court of errors and appeals affirmed the decree in this case for the reasons stated by Vice-Chancellor Leaming. The syllabus indicates the decision: "It is not an interference with internal affairs of a Pennsylvania corporation for the chancery court of New Jersey to permit such corporation to maintain in New Jersey a suit to recover from an officer of such corporation, who is a resident of New Jersey, the value of assets of the corporation appropriated by the officer to his own use in violation of his trust duties; the additional circumstance that this suit is instituted by a stockholder of the Pennsylvania company for the benefit of, and in its right, not entering into the inherent nature of the suit."

*Hill* v. *Dealers Credit Corp., 102 N. J. Eq. 310.* Complainants were two of the officers and directors of the corpotion. The defendants were the other officers and directors and the corporation itself. All its property was in this state. The bill prayed for the appointment of a receiver under the

general equity power of the court on the ground that dissention among the directors had brought the business of the company to a standstill. The defendants objected that the court had no jurisdiction to interfere with the internal affairs of a foreign corporation. Vice-Chancellor Church overruled the objection in a carefully considered opinion.

In *Fox* v. *Pathe Exchange, Inc., 106 N. J. Eq. 522,* a stockholder of a New York corporation sought the appointment of a custodial receiver on the ground of corporate mismanagement, or an injunction against defendants' further exercise of corporate franchises and the appointment of a receiver under the statutory provisions as to insolvent corporations. The bill alleged a wrongful issue of stock, a failure to exercise a valuable option, illegal advancements to subsidiary companies, dissention in the affairs of the corporation, and the like. Vice-Chancellor Buchanan said: "These allegations might be considered if defendant were a New Jersey corporation, but it is not. A custodial receiver is only appointed as incidental to and in aid of some specific relief. This court cannot give complainant any relief—assuming him to be entitled thereto—by any decree attempting to regulate the internal affairs of a foreign corporation and will not attempt to do so." The bill did not seek recovery, in behalf of the corporation, from any director or other person, or, apparently, to restrain a threatened wrongful use of the corporate capital. The only defendant was the corporation itself. The ultimate relief sought seems to have been a receivership and a winding-up of the corporate affairs. The decision is not authority for the contention that a stockholder cannot assert in this court a right belonging to a foreign corporation.

Counsel for the defendants place reliance on *Jackson* v. *Hooper, 76 N. J. Eq. 592.* Jackson and Hooper had been partners; they formed corporations under the laws of Illinois and of New York to carry on the partnership business; they quarreled, and Hooper, with the aid of a majority of the directors, deprived Jackson of an equal voice with Hooper in the companies' affairs. Hooper then brought suit

in the court of chancery to enforce his alleged rights. Vice-Chancellor Howell dealt with the problem as one of partnership; he disregarded the corporate entity, and viewed the directors as mere agents to carry out the will of the partners; he set aside, in part, their action of which Jackson complained. This decision was reversed by the court of errors and appeals. That court held that the separate entities of the corporations could not be overlooked; that the rights of Jackson and Hooper in respect to the corporations, did not pertain to them as partners but as stockholders; that a director was bound to act on his own judgment and that an agreement that he should be a mere nominal or dummy director was contrary to public policy and unenforceable; that the action of the directors in limiting the power of one of the officers—Jackson—could not be set aside on the ground that the action violated the partnership agreement between Jackson and Hooper.

"Finally," wrote Judge Dill, "the court of chancery had no jurisdiction to issue the injunction in question. The court assumed to exercise visitorial powers over two foreign corporations which are not parties to this suit and to regulate the management of their internal affairs. The phrase 'internal affairs of a corporation' as here used is well defined in the case of *North State, &c., Mining Co.* v. *Field, 64 Md. 151; 20 Atl. Rep. 1039,* as follows: 'Where the act complained of affects the complainant solely in his capacity as a member of the corporation, whether it be as stockholder, director, president or other officer and is the act of the corporation, whether acting in stockholders' meeting or through its agents, the board of directors, then such action is the management of the internal affairs of the corporation and in case of a foreign corporation, our courts will not take jurisdiction.' The courts of this state do not possess such jurisdiction and any asumption of its jurisdiction we emphatically repudiate." The passage quoted might possibly be considered unnecessary to the conclusion reached by the court; the decree below would still have been reversed if the corporations had been organized under the law of New Jersey. It

will also be noted that this was not a suit by a stockholder in behalf of his corporation; Jackson did not seek a decree in favor of the corporations. The language of Judge Dill should not be extended to a representative suit; otherwise it cannot be reconciled with the decision of the same court in *Busch* v. *Mary A. Riddle Co., supra.*

*North State Copper and Gold Mining Co.* v. *Field,* cited by Judge Dill, was not a suit by a stockholder in behalf of a corporation but was an application for a *mandamus* to compel a foreign corporation to annul a forfeiture of his stock and reinstate him as a stockholder. The Maryland rule as applied to a suit by a stockholder in a representative capacity appears in *Sloan* v. *Clarkson, 105 Md. 171; 66 Atl. Rep. 18.* The court stated the principle applicable to domestic corporations, "that when the acts of the officers of a corporation are fraudulent, illegal and *ultra vires,* any stockholder is entitled to ask for the protection of a court of equity." A like rule was applied to foreign corporations: "The right of the plaintiffs as stockholders to compel a restoration by the officers of the corporation is co-extensive with the right of the corporation itself. Surely, the corporation would not be confined to the courts of the state which created it, but could pursue its officers in whatever jurisdiction it might find them; otherwise, it would be remediless if those officers remained without the state. If the corporation could invoke the relief in this jurisdiction, the plaintiff as stockholder and director can institute and maintain such a suit."

The rule in most of the states is that where the court has jurisdiction of the person of necessary parties, it may grant relief even though the suit involves the internal affairs of a foreign corporation; that the question whether relief may be had is one of discretion, not of jurisdiction. *Babcock* v. *Farwell, 245 Ill. 14; 91 N. E. Rep. 683; 137 Am. St. 284; 19 Ann. Cas. 74; Edwards* v. *Schillinger, 245 Ill. 231; 91 N. E. Rep. 1048; Andrews* v. *Mines Corp., 205 Mass. 121; 91 N. E. Rep. 122; Travis* v. *Knox Terpezone Co., 215 N. Y. 259; Powell* v. *United Association of Plumbers, &c., 240 N. Y. 616; 148 N. E. Rep. 728; Wettengel* v. *Robinson, 288*

*Pa. 362; 136 Atl. Rep. 673; Frick* v. *Hartford Life Insurance Co., 98 Conn. 251; 119 Atl. Rep. 229; Corry* v. *Barre Granite and Quarry Co., 91 Vt. 413; 38 Atl. Rep. 101.* The rule in the United States supreme court is the same. *Burnrite Coal Briquette Co.* v. *Riggs, 274 U. S. 208; 47 S. C. 578; 71 L. Ed. 1002; American Creosote Works, Inc.,* v. *Powell, 298 Fed. Rep. 417.*

The question of jurisdiction raised by defendants is not whether jurisdiction over this litigation resides in the court of chancery or in our courts of law. If complainant cannot have relief in equity, he can have relief from no tribunal of the State of New Jersey. And this inability to obtain a judicial remedy (assuming defendants' contention is sound) results not from any defect in our law, but from a lack of power in the state itself. The extent of that power can be measured by the decisions of the courts of other states and of the United States, for the judicial authority of New Jersey is the same as that of any other state. Since I find that the courts of our sister states assume and exercise jurisdiction in cases like the present suit, I can say with much confidence that the State of New Jersey and its agency, the court of chancery, have the same jurisdiction.

Counsel for defendants urges that there is a distinction between cases founded on the fraud of officers, directors or majority stockholders of the company in behalf of which the suit is brought, and cases based on *ultra vires* acts; that while the court may have jurisdiction in the former class of cases, it has not in the latter. I doubt the validity of the distinction. The complaint that an action taken or threatened is *ultra vires* is substantially a complaint that the action violates the contract between the company and its stockholders, namely, the charter of the corporation. The jurisdiction of chancery to enforce contracts when the legal remedy is insufficient, is as well founded as its jurisdiction to enforce trusts or suppress frauds. In each case, the authority of the court is exercised *in personam* against parties brought before it. Again, if counsel for defendants mean by "fraud" express or willful fraud, then it seems clear the jurisdiction

of the court should not be so restricted. This court relieves against constructive fraud as readily as against actual fraud. Directors and officers of a corporation who employ its capital in a manner not authorized by the law under which it was created are guilty of a constructive fraud against the corporation and against stockholders who have invested their funds in the corporation in reliance that the capital would be employed in the manner prescribed by law.

The court of chancery has jurisdiction of a suit brought by a stockholder as a representative of a foreign corporation to prevent the diversion of its property from the proper purposes of the corporation or to obtain an accounting and restitution. This jurisdiction does not depend upon fraud but exists even though the diversion was accomplished or is threatened in good faith.

Whether specific performance of a contract should be decreed, whether a receiver should be appointed or an injunction be issued, is a matter of discretion. Likewise, it seems that relief on a stockholder's bill in behalf of a foreign corporation depends upon the discretion of the court, even when the relief sought is an accounting and a decree for repayment. The court must consider such questions as whether the complainant's (or the company's) right is clear; whether the decree can be enforced; whether enough parties are before the court to enable it to dispose of the entire controversy, and whether it would not be more convenient for the parties to litigate in another jurisdiction. If the right of the corporation asserted by the stockholder complainant depends upon a doubtful construction of the statutes of the state where the corporation is created, this court will usually refuse jurisdiction. No such question arises in the present case. On the other hand, it appears that all the officers and directors of the defendant company are amenable to process in New Jersey and have been made parties to this suit and that all the corporate assets are here. It is more convenient for defendants as well as complainant to litigate in New Jersey rather than to be sent to Delaware to settle their disputes. In New Jersey alone could a decree for complainant be made

effective. A court of Delaware, not having jurisdiction over the individuals involved, could not enforce its decree by process of contempt; and since none of the property is in that state, it could not enforce its decree by sequestration or through a receiver or other proceeding against the property. If a decree were obtained there and not voluntarily obeyed, complainant would have to resort to the courts of this state in order to enforce the Delaware decree. I conclude that this court has and should exercise jurisdiction in the present case.

The complainant asks that the oxidation companies be restrained from making any payments to the defendants Fischer, Van Pelt and Bibb *pendente lite*. Complainant seeks as part of his final relief against these defendants an accounting between the oxidation companies and them severally and a decree for payment to the companies of the amount found due on the accounting. Restraining payments to them *pendente lite* would prevent an increase of the amount they owe the company, and this is one of the reasons urged in support of the motion. These defendants, however, deny that they are indebted to the companies and assert on the contrary that the companies are in debt to them. I need not attempt to determine at this time which of the parties is indebted to the other, or whether, if the company be the creditor, there should be interlocutory restraint against further payments to the debtors. Looking at the matter most favorably from the standpoint of complainant, his claim that the three individuals are indebted to the company is not clearly established and does not entitle him to interlocutory restraint.

Complainant next supports his motion for restraint on the ground that the companies are paying illegal salaries to their officers. Since early in 1930, they have been paying Fischer $200 a week and Bibb $500 a month. These two men are actually carrying on the business of the companies and conducting it with marked success. The salaries were not authorized by formal action of the boards of directors until May 19th, 1931, when resolutions were adopted authorizing

these salaries. Complainant shows that the resolutions are voidable because Fischer and Bibb were two of the directors who participated in the meeting. He does not allege, however, that the salaries are excessive. Regardless of the resolutions of the directors, Fischer and Bibb are entitled to reasonable compensation for their services. Their salaries may be compared with the salary complainant received. He was a director and the principal salesman of the companies from their organization until shortly before September, 1930, when he entered the employ of another company. After that, until shortly before the bill was filed, he continued to give part of his time to the service of the oxidation companies. He received a salary from the commencement of operations of the companies at $500 a month until June 1st, 1930, then at $750 a month until September, and thereafter at $250 a month for his part-time work. His salary was not fixed by formal action of the boards, but was determined informally in the same manner as the salaries of the other officers. His services to the corporations do not appear to have been more valuable than Bibb's. The salary he accepted indicates that the other salaries are reasonable. There is no ground for interlocutory restraint against Fischer and Bibb.

The case with respect to Van Pelt does not relate to his salary. He was president of the companies and active in the business until April, 1930, when he resigned in order to accept a position with one of the large rubber companies. Because of his severance of active connection with the oxidation companies, he desired to sell his stock therein. Thereupon, on April 16th, 1930, the companies agreed to purchase his stock, three thousand six hundred shares in each company. This was thirty-eight per cent. of the outstanding stock, nine thousand two hundred and fifty shares. The nominal purchase price fixed was $25,000, but Van Pelt agreed, without further consideration, to cancel a note of the companies which he held for $4,500, and he did so. The companies agreed to pay him the $25,000 in annual installments out of surplus or net earnings realized after January 1st, 1930. Subject to the limitation that payment should

only be made out of surplus or net earnings, it was agreed that he would be paid annually ten per cent. of the net earnings plus ten per cent. of the executive and administrative salaries, and it was further agreed that such salaries should not exceed $22,000 per annum. A calculation will reveal that under this arrangement, Mr. Van Pelt would receive each year, until the full sum of $25,000 be paid him, all the earnings up to $2,444, assuming that the administrative and executive salaries remain $22,000. With the same assumption, if the net income should be $7,610, Mr. Van Pelt would receive $2,961 or that proportion of earnings which three thousand six hundred shares bears to nine thousand two hundred and fifty shares, namely, thirty-eight per cent. If net income should rise above $7,610, he would receive, on account of the purchase price of his stock, less than the amount which the stock, if retained by him, would earn. And, of course, he would get no dividends. The affidavits disclose that the actual net income for 1930, after deducting executive and administrative salaries, was $20,000. As a stockholder, his interest in these earnings would have been approximately $7,500. Actually, he received about $4,200, not as a dividend but as a part payment for his stock. The proofs show that for the first ten and one-half months of 1931 the earnings of the company were about $10,000. On the other hand, complainant shows that $5,600 was the book value of the stock which Van Pelt sold for $25,000. The laws of Delaware permit a corporation to purchase its own stock, provided that no impairment of capital is thereby caused. Since the contract expressly stipulates that Van Pelt's stock shall be paid for only out of surplus and net profits, the transaction cannot impair the companies' capital. The purchase was authorized by the law of the state under which the companies were created. The sale does not appear to have been unfair to the companies. Complainant waited a year and a half after the agreement of sale was made before attacking it. He is not entitled to an interlocutory injunction restraining the companies from making payments to Van Pelt on account of the purchase of the stock. The order to show cause will be discharged.