**T. M. EVANS, Plaintiff,**

v.

**ARMOUR AND COMPANY et al.,
Defendants.**

Civ. A. No. 38085.

United States District Court
E. D. Pennsylvania.

June 8, 1965.

Harold E. Kohn, Aaron M. Fine, Marcus Manoff, Bruce W. Kauffman, Philadelphia, Pa., for plaintiff, Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., of counsel.

Bernard G. Segal, George P. Williams, III, Philadelphia, Pa., George E. Leonard, Jr., Louis R. Miller, Chicago, Ill., for defendant, Armour and Co., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.

Edwin P. Rome, Philadelphia, Pa., for defendant, Baldwin-Lima-Hamilton Corp. Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., of counsel.

Ernest R. von Starck, Richard P. Brown, Jr., Donald A. Scott, Philadelphia, Pa., for defendant, Directors of Baldwin-Lima-Hamilton Corp., Morgan, Lewis & Bockius, Philadelphia, Pa., Arthur H. Dean, Robert MacCrate, New York City, Sullivan & Cromwell, New York City, of counsel.

CLARY, Chief Judge.

This is an action for a preliminary injunction brought by a stockholder of Baldwin-Lima-Hamilton Corporation, a Pennsylvania corporation, (hereinafter designated "BLH"), on behalf of himself, the corporation and others similarly situated, to enjoin the holding of a stockholders' meeting of BLH on June 10,

1965 called specially for the purpose of approving a merger of BLH into Armour and Company, a Delaware corporation, (hereinafter designated "Armour").

BLH is a manufacturer of "capital goods." Armour, primarily known as a food and meat processing corporation, has also diversified into the chemical and other fields in recent years. The ostensible purpose of the merger is to further diversify its activities. There is no claim in this case that the merger will run afoul of antitrust statutes. The gist of the plaintiff's complaint is that the proposed merger is the result of a conspiracy on the part of three interlocking directors of BLH and Armour to push through the merger to the detriment of individual stockholders of BLH. The moving party in this case, T. M. Evans, owned no shares of BLH stock until late December, 1964 or early January, 1965. The only proof adduced at the hearing indicates that he is the beneficial owner of some 46,000 shares of stock, or less than 1.25% of the total outstanding shares of BLH.

The charges are mainly leveled at three of the defendants: William Wood Prince, who is chairman of the board and chief executive officer of Armour and also a director and member of the executive committee of BLH; George A. Rentschler, a director and member of the executive committee of Armour and director and chairman of the executive committee of BLH, and Milton Steinbach, a director and member of the executive committee of Armour and BLH and also the managing partner of Wertheim & Co., an investment banking firm. Another defendant who is intimately connected in plaintiff's charges is Francis L. Elmendorf, a director of BLH and a limited partner of Wertheim & Co. He is also a director of International Packers, Ltd., in which Armour has a substantial investment of some $13,000,000, but over which, the evidence clearly shows, Armour has absolutely no control since the shares have been placed in a voting trust by court order.

In late January or early February, 1965, defendants, Prince and Rentschler, while vacationing in Mississippi, had occasion to discuss the business problems of both Armour and BLH. Prince suggested to Rentschler that some thought should be given to the possibility of merging the two companies. They agreed that they should consider the matter carefully and to explore the proposition further.

After an executive committee meeting of BLH held in the Barclay Hotel in Philadelphia on February 24, 1965, Prince and Rentschler were discussing the matter in a suite jointly occupied by Steinbach and Rentschler. At that time, they decided that the proposal merited further attention, and Steinbach was brought into the discussion. Recognizing that all three were members of the executive committees of both corporations, they concluded that counsel should be consulted. It was also determined that Steinbach of Wertheim & Co. should act as financial advisor, if counsel first approved of his assuming this role. Arthur H. Dean, of the New York law firm of Sullivan and Cromwell, was selected as counsel. Prince and Rentschler decided at this time to refrain from any future negotiations, except for participating in the discussion of the final form. Rentschler designated Perry A. White, president, director and a member of the executive committee of BLH, also a defendant, to act as negotiator if a merger were thought feasible. Prince designated Edward McAdams, Armour's financial vice president, as negotiator for Armour in the event any feasible proposition were advanced.

Steinbach consulted Dean and was told in no uncertain terms that because of his position on both boards that any suggested terms of merger would have to meet the scrutiny of, and be approved by, an independent investment banking firm, and even at that time indicated the type of approval which it would be necessary to secure in order to meet legal requirements. Dean further advised all those in interest to keep the matter com-

pletely secret with a view towards avoiding the untimely disclosures which resulted in the recent Texas Gulf Sulphur litigation.

McAdams first met with Steinbach, whose job consisted of developing the framework for any merger proposals. McAdams at the outset took a dim view of merger possibilities. Armour had recently offered rights to their shareholders which, from an earnings point of view, represented a ten percent dilution, and he didn't think the company ought to suffer any further earnings dilution. McAdams maintained this position until the suggestion was advanced that "purchase accounting" be used. Thereafter, he expressed interest in the merger plans because in his judgment the use of purchase accounting overcame the dilution problem. Steinbach thereupon notified Rentschler that this framework for negotiations had developed; Rentschler in turn instructed White to confer with McAdams to investigate further the merger terms. McAdams and White then met in their roles as chief negotiators for their respective companies.

Discussions began with the tentative proposal that each share of the common stock of BLH would be converted into one-eighth (or $12.50) of a share of preferred stock (cumulative and $100 par value), and one-sixth of a share of common stock ($5.00 par value) of Armour, then selling at approximately $47.00 per share. This would mean a transfer of securities having a value of approximately $21.00 for each share of BLH stock which had over the previous ten-year period sold between $12.00 and $15.00 per share. Negotiations continued in the normal give and take fashion. White attempted to get convertible preferred which McAdams stated he would not accept under any circumstances. When it became obvious to White that insistence upon this feature would mean no merger or prospect of it, he agreed to a straight preferred stock. However, he did negotiate the one-eighth share of stock to 13/100ths, or an additional $2,000,000 for the BLH stock. From the beginning

White took the firm position that the dividend rate on the preferred should be $4.75, while McAdams talked in terms of $4.60 or $4.65. In the interim, Goldman, Sachs & Co., an investment banking firm, had been consulted, and after analysis of the terms, rendered its oral opinion that the proposed exchange would be fair and equitable to both companies, and that the preferred stock would sell at par if the projected dividend rate were maintained at $4.75. In light of this opinion, McAdams agreed to the $4.75 rate.

There followed a meeting of the board of directors of both companies on March 31 and April 1, 1965 in Chicago, which approved the merger in principle, and a later meeting in Philadelphia of both boards on April 20, 1965, where the terms of the merger were formally approved. At neither of these meetings did Prince, Rentschler or Steinbach vote on the proposition, although they participated in the discussions. Printing difficulties and the press of time made it impossible to have the notice of the proposed merger in the mails in time for the annual stockholders' meeting on May 6, 1965 and accordingly, the matter was not there discussed. Because of the institution of this suit on May 13, 1965, a special meeting of the directors was held in Philadelphia on May 19, 1965 to which were invited the named plaintiff and his counsel. Evans presented reasons to the board why he thought the merger was unfair to stockholders, and after reviewing his proposals, the directors ratified their previous action, but not before Prince, Rentschler and Steinbach left the meeting.

On May 25, 1965, the present motion for preliminary injunction was filed to enjoin the stockholders' meeting scheduled for June 10, 1965. Testimony began on June 1 and continued through June 4, 1965. In the complaint and motion the plaintiff charges, in broad outline, conflict of interest, violations of the Securities and Exchange Commission's regulations regarding the proxy statement, breach of corporate fiduciary duty, and

fraud. In addition, there is a charge of over-all unfairness to individual stockholders in the exchange and that unless enjoined, irreparable harm will be suffered by plaintiff and the individual stockholders. All of these charges can be grouped under two broad headings: false and misleading statements in the BLH proxy solicitation and the questions of the fairness of the BLH board of directors. They will be discussed in this fashion.

## I.

### Proxy Misstatements

The plaintiff complains of false and misleading statements and omissions in the proxy statement sent to BLH shareholders on May 5, 1965 (Exhibit P–25). Rule 14a–9 of the Securities and Exchange Commission provides in part that no proxy solicitation shall be made containing any statement which under the circumstances is:

"* * * false or misleading with respect to any *material* fact, or which omits to state any *material* fact necessary in order to make the statements therein not false or misleading * * *" (Emphasis added.)

The key to determining whether or not a violation of this regulation has been committed is the word "material." The word has been subjected to many definitions and much litigation, but in essence the statement or omission claimed to be misleading must amount to one that would influence the stockholder's vote. See 2 Loss, Securities Regulation 917–18 (1961).

Plaintiff contends that the failure to include in the proxy statement: the relation of Elmendorf with Wertheim & Co. as a limited partner, his management consulting relationship with Wertheim, and that he was a director of International Packers, Ltd., in which Armour had a substantial interest, constituted material omissions.

The uncontradicted testimony of Mr. Steinbach is quite clear on these points.

At the suggestion of Mr. Steinbach whom he had known for many years, Mr. Elmendorf invested $100,000 in the firm of Wertheim & Co. for which he receives a fixed return of 5% on his investment. As a limited partner he receives absolutely no share in the profits and would continue to receive his return whether or not Wertheim was used and paid for its work on this merger. At no time was he consulted, nor did he appear with any of the Wertheim people when they were studying and analyzing proposals for the exchange. It was testified that he resides in Cleveland, has no desk, office space or other physical connection with Wertheim. He talks occasionally by phone to Steinbach and will visit the company when in New York.

It also appears that Mr. Elmendorf has wide experience and competence in the managing consultant field and in this connection his firm is being paid a fee of $24,000 to attend to the organizational problems of Wertheim. This type of business relationship is so widely removed from the every day problems of investment banking that no inference can be drawn that would affect his impartiality.

That Elmendorf is on the board of Independent Packers, Ltd., in which Armour has a substantial investment, only tells half the story. Armour owns 700,000 shares of stock in Independent Packers over which it has no control. The shares are in a voting trust by court order and are voted by the voting trustees. The remoteness of this connection with Armour is obvious. In the light of all these facts and circumstances, I am asked to conclude that a stockholder could not make a reasonably informed judgment absent these facts, and that their omission would influence the stockholders' vote in this merger. The evidence does not support such a conclusion. In my opinion, these omissions are not in any way "material" within the meaning and purposes contemplated by the regulation.

The plaintiff further argues that the proxy statement should have reported that Armour's earnings for the first six

months of fiscal 1965 had declined 14%, from $1.66 in the previous year to $1.35 in the current year. This information was not available and this fact could not have been definitely ascertained at the time the proxy statement was prepared. Furthermore, an indication that a drop in earnings would occur was specifically noted in the statement as is manifest from the following quotation: "It does appear, however, that there will be some decline in earnings for the first half of 1965 from the corresponding period of 1964." (Exhibit P–25, p. 6). I find that no material omission has been established.

The plaintiff alleges a material omission in failure to notify the stockholders of a potential antitrust claim against General Motors for driving BLH out of the locomotive business. The record is unmistakably clear on this point. In the opinion of the company executives, BLH's going out of the diesel locomotive business was attributable to their late start in the field and their inability to produce a good competitive product. This is the sound business judgment of competent executives, and I place no significance on this so-called failure to disclose.

Plaintiff also deems material the failure to state that between 1966 and 1969, seven plants of Armour will close, having a value of $17,000,000, which would be reduced at the time of closing to $9,500,-000. The plaintiff's source for this averment is the opinion of Price Waterhouse & Co., an accounting firm, that Armour might, by 1969, close these plants. Every defendant director questioned on this point unanimously concurred that Armour has no such plans, has not considered any such plans, and has no intention of closing the plants. As chief executive officer of Armour, Prince candidly stated that they are always reviewing operations with the intent of getting maximum results with minimum expenditures, and that it was certainly conceivable that sometime in the future they might find it necessary to close or even open plants. But there is absolutely no evidentiary support for plant retirement plans such as the plaintiff envisions, and his contention is plainly without merit.

All the remaining contentions as to conflict of interest, breach of corporate fiduciary duty, and fraud, are so intermingled that they will be discussed under the general heading of fairness. There are two aspects of the problem of fairness in this transaction—(1) whether or not the directors, including the interlocking directors, acted fairly and (2) whether the exchange is fair.

## II.

### The Fairness of the Directors

The fiduciary duty of directors to their corporations, well known at common law, has been crystallized into statute in Pennsylvania. Pa.Stat.Ann. tit. 15 § 2852–408 (1958). Judicial refinements of this broad concept have not been lacking. Prominent among the refinements have been judicial guidelines for the increasingly common problem of interlocking directorates. See Ward, Some Notes on Transactions Involving Interested and Interlocking Directors in Pennsylvania, 23 Temple L.Q. 107 (1949).

The general rule in Pennsylvania is that transactions between corporations having interlocking directorates are voidable, not void. Bowman v. Gum, 327 Pa. 403, 193 A. 271 (1937). In order, however, to have such transactions declared void, there must be some showing of fraud or unfairness. Bonini v. Family Theatre Corp., 327 Pa. 273, 194 A. 498 (1937). The reasoning in support of these holdings is that corporations should not be deprived of the benefit of years of experience, and the financial wisdom and acuity of a member of a business community, simply because he is the member of another board of directors.

What is fairness will vary with the facts and circumstances of each case, but certainly this Court's attention will be directed toward probing the questions of whether the director has availed himself of his position to further his personal interest, rather than the welfare of his company, and whether he gave his

best judgment in the interest of the company "untrammeled by any hostile interest in himself or others." Bird Coal & Iron Co. v. Humes, 157 Pa. 278, 288, 27 A. 750, 752 (1893); see Bowman v. Gum, supra.

The specific allegations made by the plaintiff in this case must be and have been scrutinized to determine whether Prince, Steinbach and Rentschler's activities as directors are free from any suspicion of "secret dealing in favor of one principal while acting as a representative of another." South Side Trust Co. of Pittsburgh v. Washington Tin Plate Co., 252 Pa. 237, 97 A. 450 (1916).

In his motion, plaintiff charges that Rentschler and Steinbach controlled and influenced members of the board to approve the merger. The evidence is directly to the contrary. Had the three taken part in the vote at the meetings above outlined on the plan of merger or the confirmation, there might be some slight validity to plaintiff's charges. Here there is none. Influence is a general term meaning many things in different contexts. The evidence shows that Prince, Rentschler and Steinbach did participate in the discussions, answering questions about the plan, to which the plaintiff attaches the appellation of "influence." It would be absurd if a director could not ask a fellow member of the board of directors a question about the plan, or even ask his opinion. In fact the director might be remiss in his fiduciary obligation if he did not so inquire. No court has banned an interlocking director from attending meetings on issues in which he has an interest. The ban extends only to voting and properly so. Other than evidence of participation in these discussions, there isn't a scintilla of evidence of influence in an improper sense or certainly any evidence of "control" in a coercive or any other sense.

Plaintiff also avers and contends that the directors have acted subject to a conflict of interest by being on both boards, or by having a direct monetary interest in the merger. Apparently plaintiff here equates "conflict of interest" in its popular unethical meaning with legal wrongdoing. As above stated, there is nothing illegal about being a member of both Armour and BLH boards, if that is the conflict of interest of which plaintiff speaks; the question to be decided is whether their dealings with the corporations as directors were fair. Thus far, there has been no showing of unfairness. If by having a "direct monetary interest" in the merger plaintiff means more than the directors' stock ownership, he has not shown it. The mere fact of stock ownership is not controlling so long as their personal interests have not been escalated at the expense of the corporation. Another charge directed by Evans at Steinbach is that he falsely reported to the board that the plaintiff told him the terms were satisfactory. I have no hesitation in finding that Steinbach's testimony as to the substance of Evans' conversation with him was entirely candid, fair, and true. Evans has not chosen to deny it, and I find as a fact that he expressed no disagreement with the terms of the merger before it was voted on in principle, and I find that he had full and complete knowledge of the fact before the vote.

Plaintiff also, as above related, alleges fraud in that Prince misrepresented to the BLH directors that it was expected that Armour profits would continue to increase during the year 1965. This charge is completely false and I so find. The evidence shows that the statement was that Armour had "budgeted an increase in profits." Prince defended the statement on the witness stand, and his testimony has not been contradicted nor diluted by cross-examination. There is no reason for this Court to suppose or hold that because of one particular month in the year, and the testimony is that that is not unusual, the budgeted increase will not ultimately materialize.

An additional charge of unfairness is plaintiff's allegation that the three interlocking directors concealed the terms of the merger from other board members.

This argument is entirely destroyed since, as stated above, they acted on the advice of competent counsel which was given at a time when the evils of premature disclosure were greatly publicized. This advice was given out of caution, not for concealment, and was strictly in accordance with the stated policy of the New York Stock Exchange. To label it either unfair or fraudulent is preposterous.

Plaintiff also contends that there was a legal failure of a quorum at the directors' meeting when the merger was approved because of Elmendorf's partnership interest in the investment banking firm of Wertheim & Co., one of the firms consulted on the terms of the merger and one of its co-managers. Wertheim is to receive a fee of $120,000 for its services. What has been said in the discussion on the proxy statement with respect to Elmendorf is pertinent at this point. Elmendorf received only a fixed return on his investment and could not possibly benefit by any fee received by Wertheim. His firm's consulting activities with respect to organizational problems within Wertheim does not, in the opinion of the Court, result in his being disqualified. Elmendorf, the record shows, had absolutely no connection with any negotiations between McAdams and White, and there is no reason for this Court to disqualify a person by this association.

### III.

#### The Fairness of the Proposed Plan

As a general rule, courts are reluctant to interfere in the internal affairs of a corporation. These are left to the sound discretion and good business judgment of those who know the corporation intimately, the directors. It is only when this discretion is abused to the extent that shareholders are left unprotected as a result of the directors' failure to act properly in their roles as fiduciaries that the court will intervene. See Hunt v. Aufderheide, 330 Pa. 362, 199 A. 345 (1938) and the discussion in Otis & Co. v. Pennsylvania R. R., 61 F.Supp. 905, 910–911 (E.D.Pa.1945),

aff'd mem. 155 F.2d 522 (3d Cir. 1946). Furthermore, it should be pointed out that when the law has occasion to inquire into these matters, it is not to substitute its judgment as to whether one offer is better than another, or to resolve disagreements as to how the future business pattern of the corporation should proceed, but rather to determine if the directors have acted soundly and in accord with accepted business practices. In this case, the ultimate question is whether the terms of the proposed merger are fair.

The Court did not have the benefit of the direct testimony of the plaintiff, nor was his deposition available. But it appears from conversations that he had with certain members of the BLH board and from the proposals he advanced at the May 19th meeting that the basis of plaintiff's dissatisfaction is with the fairness of the package. His proposal to Mr. Steinbach on April 1st was to try for a $22.00 package. The package finally approved was $21.00. In his opinion, BLH was not in a growing industry and a liquidation would be desirable since, if sold separately, the various properties of the company would yield close to book value. In his opinion, all of the properties should be sold and the company retained as an investment trust.

On this issue, whether or not the actual terms of the plan were fair, the defendants produced the testimony of Mr. Schrader, senior partner in the investment banking firm of Goldman, Sachs & Co. Contrary to the opinion of counsel for the plaintiff that Goldman, Sachs was a "patsy" paid to give a favorable opinion, the Court finds as a fact that Mr. Schrader was completely independent of, and in no way connected with or obligated to Steinbach or Wertheim & Co. His knowledge of securities and finance, his straightforward presentation of his investigation and his conclusions based thereon greatly impressed the Court. It was his opinion that the plan was fair to both Armour and BLH shareholders. The evidence was crystal-clear that the Goldman firm made a genuine, critical analysis of the transaction and that its

opinion was rendered independent of any outside interest, despite innuendo and inference from the plaintiff to the contrary. The Court was also impressed with the testimony of Edward Hopkinson, Jr., a respected member of the bar of this Court, and for almost forty years an investment banker of high reputation. He testified in unequivocal language that the plan offered advantages to the shareholders of both companies, and I respect his opinion and business judgment. Evans' proposition that some BLH divisions be liquidated, without in any way indicating to the BLH board how it could be done, has no merit. The testimony is clear that the board of directors had over the years attempted to do that very thing and had been unsuccessful in so doing. This evidence comes from several of the directors and stands unimpeached on the record.

Reiterating, the substance of the plaintiff's criticism of the terms of the proposed plan is directed at the package price which the Court finds is fair and which fact is adequately supported by the record. In addition to his complaint as to the exchange ratio, the plaintiff leveled charges of unfairness and malfeasance on the part of the directors in arriving at the proposed terms. These charges are of alleged delinquency in the exercise of corporate fiduciary duty. The plaintiff is asking this Court to substitute its judgment for that of the directors, contrary to the sound rule of law which protects directors from liability for business decisions that are made observing the standards of due care. The so-called business judgment rule presupposes a decision by board members that is honest, unbiased, in compliance with fiduciary obligations, and a judgment that has been exercised reasonably and with due care. See Zweifach v. Scranton Lace Co., 156 F.Supp. 384, 395 (M.D.Pa.1957); Otis & Co. v. Pennsylvania R. R., supra. All of the following allegations have been examined in that light.

The plaintiff complains that the directors made little effort to inform themselves of the financial facts concerning both corporations. The evidence is directly to the contrary. The directors had more than three weeks to consider the various aspects of the merger plans and to study the materials available. That they could not, without balance sheets or any other notes, remember specifics therein contained I consider of no significance. Men of stature are on the board of directors of BLH; they are frequently immersed in financial figures and have no obligation to memorize exact amounts at exact times. That they have the opportunity to review them at the necessary time is all that the law requires. Certainly, when one considers the plethora of figures and footnotes collated on financial statements, it would be entirely too much to demand that they be able to repeat them from memory.

The plaintiff says that the directors made no effort to improve the terms of the sale or to make more satisfactory arrangements than those finally approved. Again, the record discloses that Mr. White, as president of BLH and chief negotiator of the final terms, did in fact improve the terms from the original offer by some $2,000,000. The evidence also demonstrates that other offers were known and considered by various officers, but in their judgment they were not of sufficient importance to report to the board as a group, let alone effect a cessation of present merger plans. As the record in this case clearly demonstrates, no sale or merger can ever be launched until the seller finds someone interested in buying at a price attractive to him, and one which the directors could conscientiously recommend to each other and to the stockholders.

Evans complains that the BLH assets are being transferred to Armour at a value $20,000,000 less than their book value. The Goldman opinion is a complete answer to this charge. The Goldman opinion was that the exchange was fair and the BLH directors were entitled to rely on it. This Court is not warranted in voiding or interfering with the agreement because an individual

plaintiff, who has offered no evidence from competent sources, claims that it is unfair. Judge Learned Hand disposed of the contention that book value is the proper measure of a corporation's value when he said:

"The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and, second, that liquidation values are a measure of present values. Every one knows that the value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light. When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible." Borg v. International Silver Co., 11 F.2d 147, 152 (2d Cir. 1925).

Finally, White is charged with delinquency in his duties by falsely representing to the other members of the board that the Goldman firm stated that the preferred would sell at par, when in fact this was not their opinion. As allegedly irrefutable proof, the plaintiff offered the written opinion of April 14th which does not contain that statement. The evidence shows beyond dispute that Goldman's oral opinion so stated, and this fact was reaffirmed under oath in this record.

### IV.

### Remedy

There was much discussion in the briefs and at the oral argument on how the United States Supreme Court's decision in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) might affect the remedy in this case. The plaintiff's complaint states both state and federal causes of action. The Pennsylvania statutes speak directly and specifically of the remedy for a shareholder who objects to a proposed plan of merg-

er. Under the statute the dissenter has the right to exchange for his shares their fair value. See Pa.Stat.Ann. tit. 15 § 2852–515. Section 515, subd. K makes this the exclusive remedy, and the Pennsylvania courts have carefully obeyed that section's mandate. Thus in a proper case, a court could justifiably conclude that it has no power to grant an injunction and that the plaintiff's remedy at law of appraisal is adequate.

However, when relief is sought on a federal cause of action, such as the one alleged in the instant case, the question of remedies takes quite a different complexion since Borak. In that case, where a merger was alleged to have been authorized as a result of misleading proxy statements, the Supreme Court held that the scope of relief for violations of the proxy rules was a federal question, and that the courts should endeavor to fashion a remedy that best effectuates the congressional purpose. It may be then that in the appropriate case, a court could grant injunctive relief despite state statutes which declare a remedy exclusive, and Borak has been so interpreted. See Eagle v. Horvath, 241 F.Supp. 345 (S.D.N.Y. April 22, 1965); Fleisher, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1168–72 (1965).

In this case, however, the Court need not reach or make any decision on these questions for, here, it is quite clear that the plaintiff has not made out a cause of action for circulating a misleading proxy statement, or, for that matter, any other cause of action. To enjoin further action on the basis of the present merger plans would be doing inequity rather than equity.

### V.

### Conclusion

In sum, I am asked to hold that Prince, Rentschler and Steinbach are men of doubtful probity. This I refuse to do. All three men were in Court, as well as several of the other directors, and over a period of four days, I was able to see them and hear them. I believed them.

They are men of character who used in this instance honest business judgment, and I respect that judgment. BLH was fortunate to have on its board financial men of real stature. Messrs. Steinbach and Hopkinson are well known investment bankers. Mr. Potts, now chairman of the board of the Philadelphia National Bank, has had long experience in financial affairs. Another member, Mr. Sperry, had extensive banking experience. When men of this calibre unanimously agree that the exchange is fair and will be a benefit to both companies in light of the facts and circumstances heretofore discussed, and without any opposing evidence to the contrary, it would be rather difficult for a Court to find a basis for interfering with their business judgment.

The above narrative opinion may be taken as the Findings of Fact and Conclusions of Law of the Court under F.R. Civ.P. 52. The plaintiff herein has not established fraud, violation of the Securities and Exchange Commission regulations, breach of fiduciary duty, or conflict in interest, which would warrant this Court in entering a preliminary injunction.

Of the plaintiff's requested Findings of Fact, the following are affirmed: 1, 2, 3, 4, 5, 6, 7, 10, 11, 21, 23, 24, 27, 28, 29, 33, 47; the following are denied: 30, 32, 34, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46 and the following are refused as stated: 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 25, 26, 31. In the numbering of plaintiff's Findings of Fact, the number 35 was omitted. Of the plaintiff's proposed Conclusions of Law, the following are affirmed: 1, 5, 6, 7, 9, 12; the following are denied: 2, 3, 4, 10, 11, 13, 14, 15, 16, 17, 18, 20 and the following are refused as stated: 8 and 19.

Of the requested Findings of Fact of the defendant, Baldwin-Lima-Hamilton and the individual director defendants, the following are affirmed: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30; number 31 is denied and numbers 32 and 33 are refused as stated.

Of these defendants' proposed Conclusions of Law, the following are affirmed: 1, 3, 4, 7, 9, 10 and 11, and the following are refused as stated: 2, 5, 6 and 8.

Of the defendant's, Armour, requested Findings of Fact, 1 and 2 are affirmed; of the proposed Conclusions of Law, 1, 2 and 3 are affirmed, and 4 is refused as stated.

An appropriate Order has been entered.