Andrew **ALLEN**, derivatively and on behalf of himself and all others similarly situated, Plaintiff,

v.

**PENN CENTRAL COMPANY et al.,**
**Defendants.**

**Civ. A. No. 72–1678.**

United States District Court,
E. D. Pennsylvania.

Nov. 3, 1972.

As Amended Nov. 21, 1972.

Hurd Baruch, Samuel E. Dennis, Robert C. Cohen, Meltzer & Schiffrin, Philadelphia, Pa., for plaintiff.

David Berger, Leonard Barrack, Gerald Jay Rodos, David Berger, P. A., Matthew J. Broderick, Norma L. Shapiro, Dechert, Price & Rhoads, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Plaintiff, a shareholder and since August 24, 1972 a director of the Penn Central Company ("the Company"), brings this action on his own behalf and as a representative of a class as defined by F.R.Civ.P. 23. The proposed class consists of all holders of the Company's common stock on July 7, 1972, the date of record for voting at the Annual Meeting of August 24. The Company and its Directors are defendants.

On July 17, 1972, the Board of Directors solicited proxies for approval of a Plan of Refinancing ("the New Plan") designed to satisfy a debt of which the Company has guaranteed repayment. The solicitation was accompanied by a Proxy Statement and Annual Report; a Supplement to the proxy statement was mailed to the shareholders on August 9, 1972.

Plaintiff alleges that the proxy statement and supplement contain false and misleading statements of material facts in violation of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and of S.E.C. Rule 14a–9 adopted thereunder, 17 C.F.R. § 240.14a–9; that the proxy statement and supplement, together with defendants' prior course of conduct, constitute fraud under § 10(b) of the Act, 15 U.S.C. § 78j, and S.E.C. Rule 10b–5 adopted thereunder, 17 C.F.R. § 240.10b–5; and that the negotiation of the New Plan constitutes waste of the Company's assets under Pennsylvania law.[1] Plaintiff asks us to appoint a special receiver who would survey the Company's options for dealing with its indebtedness and report back to this court with recommendations for further relief.[2]

1. We have jurisdiction of the first two counts under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and of the third under the doctrine of pendent jurisdiction, United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. In his complaint, plaintiff asks that we enjoin defendants from holding the August 24 Meeting and from consummating the New Plan of Refinancing, and order them to resolicit proxies; that we issue a declaratory judgment stating that the Penn Central Company's guarantee of the indebtedness of its subsidiary, Penn Central International N. V., is invalid; and that we grant "such other relief as this Court may deem just and appropriate under the circumstances."

In his briefs and at oral argument, plaintiff requested that we appoint a special receiver for the Company. We assume that this comes under the category of "just and appropriate" relief. It is the only relief which we need seriously consider granting. Counsel for plaintiff stated at oral argument that he was not asking us to order a resolicitation of proxies because he felt that resolicitation would be an inadequate remedy (N.T. 79). Plaintiff stipulated on August 22 that the Annual Meeting would proceed as scheduled; his request for an injunction is therefore moot. For reasons discussed in this opinion we think that the merits of the Plan and the validity of the debt are matters on which we should not pass judgment. We are therefore left only with plaintiff's request that we appoint a special receiver.

In early 1970, Penn Central International N.V. ("International"), a wholly-owned subsidiary of the Company, borrowed approximately $59,000,000 in Swiss francs from a number of foreign financial institutions ("the Noteholders").[3] Repayment was unconditionally guaranteed by the Company. On February 25, 1971, the original Notes were exchanged for Extension Notes, again issued by International and guaranteed by the Company, and the Company, International and the Noteholders agreed to enter into a permanent plan of refinancing. That plan ("the Old Plan") was submitted to the stockholders for their approval but this court held on December 3, 1971 that management's proxy material was false and misleading in violation of § 14(a) and Rule 14a–9. Robinson v. Penn Central Company, 336 F.Supp. 655 (E.D.Pa. 1971).

The new Board of Directors, which now includes the plaintiff in *Robinson,* then proceeded to negotiate the New Plan under which New Notes will be exchanged for the principal amount of the Extension Notes plus the 10%-per-annum interest which has accrued on the Extension Notes. The shareholders, after receiving the proxy materials at issue here, approved the New Plan at the August 24 Annual Meeting by a vote of 12,123,720 shares to 1,807,599 shares.

Although, for reasons which we shall discuss shortly, we decline to rule in any way on the merits of the New Plan, some familiarity with its terms is essential to an understanding of the disputed proxy materials. The New Notes, which like the Extension Notes are payable in Swiss francs, will be issued by International and unconditionally guaranteed by the Company. They will mature on June 1, 1986, subject to a mandatory sinking fund beginning June 1, 1982, and will bear simple interest at the rate of 7½% per year. Cash interest will not be payable until 1976, although interest will accrue from June 1, 1972. The New Notes will be secured by 35% of the common stock of the Penn Central Transportation Company, 100% of which is the Company's principal asset; by assignment of International's claims against two leased-line subsidiaries of the Penn Central Transportation Company arising from the issuance of the original 1970 Notes; and by funds from which the Company's operating expenses are currently being paid and will continue to be paid under the New Plan. The Noteholders will receive warrants which will enable them to acquire an equity interest in 10% of the Company's outstanding common stock upon exercising the warrants at $5.50 per share. The principal amount and accrued interest of the New Notes may be applied to the purchase price.

The New Plan also provides that unless they obtain the prior consent of the Noteholders, the Company and International may not (in the words of the proxy statement) "declare dividends, sell or acquire assets, merge, issue new shares of stock, incur liabilities outside the ordinary course of business, engage in new business, incur new debt or encumber their assets." Proxy Statement at 11. Some of these restrictions will be removed when and if 70% of the New Notes are retired.

Section 14(a) of the Securities Exchange Act of 1934 makes it unlawful to solicit any proxy in contravention of whatever rules and regulations the Securities Exchange Commission may prescribe as necessary or appropriate in the

3. Most of the proceeds were loaned by International to two leased-line subsidiaries of the Penn Central Transportation Company; the subsidiaries immediately transferred the funds to the Transportation Company, which used them mainly for its 1970 operating expenses. Approximately $11,880,000 was not used for operating expenses, but was instead advanced to the Company and then contributed to the capital of International. The Transportation Company, 100% whose stock is the Company's principal asset, petitioned for reorganization in June, 1970.

public interest or for the protection of investors. Rule 14a–9 prohibits in any proxy material

> " * * * any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a–9.

The Supreme Court, in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), has established the test for determining whether a fact misstated or omitted in a proxy statement is material. To find materiality a court must find that "the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." Mills v. Electric Auto-Lite Co., at 384, 90 S.Ct. at 621. The central question is not whether the defect actually had a decisive effect, but rather whether it has a "significant *propensity* to affect the voting process." [Emphasis in original.] *Id.*

It is easy to find small errors and trivial omissions in any proxy statement, but "[r]easonable latitude in this area is important if nit-picking is not to become the name of the game." Kohn v. American Metal Climax, Inc., 458 F.2d 255, 267 (C.A.3, 1972). It is at least equally important, however, that shareholders not be deprived of adequate and honest information through the cleverness of corporate draftsmen and their legal advisers. The standards of the 1934 Act and Rule 14a–9 will not be met by a proxy statement which is free of major misstatements but which, when read as a whole by a reasonable shareholder, conceals the real nature of the proposal for which the shareholder's vote is being sought. Gould v. American Hawaiian Steamship Co., 319 F. Supp. 795, 810 (D.C.Del.1970). The proxy material must, subject to the inherent limitations of the art, convey an honest and candid picture of the proposal.

Plaintiff has vigorously argued that the New Plan is a bad one. We decline, however, to express any opinion on the substance of the plan. Nowhere in the language of § 14(a) or Rule 14a–9 can we find the slightest hint of a mandate for the courts to pass on the wisdom of a position for which proxies have been solicited. The only issue in an action arising under § 14(a) is the sufficiency of the proxy material itself. A court must determine whether the shareholders have been given sufficient information to make a rational, well-informed choice; if they have, the court may not substitute its own judgment for that of the shareholders. To reach a decision on the merits of the New Plan of Refinancing would make as much a mockery of the ideal of corporate democracy as does the sort of false and misleading proxy statement which § 14(a) and Rule 14a–9 were designed to outlaw. *See,* Mills v. Electric Auto-Lite Co., *supra*; Colonial Realty Corp. v. Baldwin-Montrose Chem. Co., 312 F.Supp. 1296, 1299 (E.D.Pa.1970).[4] We therefore consider only plaintiff's allegations of deficiencies in the proxy statement and supplement.

Some of plaintiff's objections to the proxy material are essentially criticisms of style and emphasis. Plaintiff alleges that the proxy material fails to state that under the New Plan substantially all of the Company's future income will be channeled to the Noteholders un-

---

4. Plaintiff appears to believe that we passed, at least by implication, on the merits of the Old Plan in *Robinson*. He is mistaken. We said there that "we wish to make clear that we intimate no opinion as to the merits of the proposed Plan * * *." Robinson v. Penn Central Company, *supra*, 336 F.Supp. at 658.

til 70% of the Notes have been retired; that exchange-rate fluctuations may increase the amount due the Noteholders; and that the Noteholders, as secured creditors, stand in a very favorable position no matter what happens to the Company. It can hardly be questioned that these are material facts under the standards enunciated in Mills. Although the language used and the emphasis given to each statement in a proxy solicitation are factors to be considered in deciding whether there has been adequate disclosure of material facts, "[t]here is no requirement that a material fact be expressed in certain words or in a certain form of language." Richland v. Crandall, 262 F.Supp. 538, 553–554 (S.D.N.Y.1967). To engage in a lengthy stylistic exigesis of the proxy statement and supplement would serve no useful purpose. We therefore simply say that these three points are fully and candidly discussed in the proxy material.

Plaintiff also charges that defendants omitted from the proxy material discussions of (1) the possibility of immediate reorganization; (2) legal questions about the validity of the Company's existing debt to the Noteholders; and (3) the factors that might have gone into a determination of the exercise price of the warrants.

Plaintiff alleges that the proxy statement does not explain the consequences of immediate reorganization or bankruptcy and therefore fails to present the shareholders with an intelligent alternative to the New Plan of Refinancing. The proxy statement points out that the Company is likely to face reorganization or bankruptcy proceedings if, "as may well be the case," it is unable to make the principal and interest payments as they become due under the New Plan. It also states that reorganization or bankruptcy would be unavoidable if the New Plan were not approved, and that the Board of Directors recommends that the Company avoid reorganization at least until a plan of reorganization has been determined for the Penn Central Transportation Company. The proxy statement does not describe the nature of proceedings under the Bankruptcy Act.

■■ We find no deficiency in defendants' treatment of the possibility of bankruptcy or reorganization. Drafters of proxy statements have no obligation to discuss every conceivable alternative to the course of action for which management seeks shareholder approval. "Theoretically the number of alternatives to any [proposal] is infinite. To drench the shareholder with a flood of information may defeat the very purpose of [Rule 14a–9]." Doyle v. Milton, 73 F.Supp. 281, 285 (S.D.N.Y.1947). See also, Richland v. Crandall, supra, 262 F.Supp. at 553.

Furthermore, any discussion of what might happen to the Company in reorganization or bankruptcy proceedings would be speculative at best. It is difficult to predict with accuracy what a reorganization court will do in any given situation; it is nearly impossible to do so in this exceedingly complex case. If the proxy statement were too specific in its discussion of bankruptcy and reorganization, it would come dangerously close to engaging in the kind of prediction mentioned in the S.E.C.'s Note to Rule 14a–9 as an example of misleading statements within the meaning of the Rule. Walpert v. Bart, 280 F.Supp. 1006, 1015 (D.Md.1967), aff'd. 390 F.2d 877 (C.A.4, 1968).

■ The proxy material, according to plaintiff, also fails to explain that the validity and enforceability of the Company's existing guarantee of indebtedness due the Noteholders may be the subject of dispute, and that repayment of the existing Notes therefore may not be an obligation of the Company. Plaintiff is correct in stating that, beyond noting that the Trustee of the New York, New Haven and Hartford Railroad Company had taken the position that the validity of the debt should be adjudicated, this question is not discussed in the proxy statement. We think it was properly omitted, for to

have gone into it would have constituted the most reckless kind of speculation. No steps have been taken toward litigating the validity of the debt; and the New Haven Reorganization Court, in its Order No. 679 dated August 15, 1972, did not instruct the New Haven Trustee to do so, but left the matter along with certain other matters, to the Trustee "in the sole exercise of his discretion". It is an issue on which there are few undisputed or proven facts and many differences of opinion. Anything that might have been said about it in the proxy material would almost certainly have been misleading, and we are not convinced that a wild guess as to how this question might finally be determined is a material fact which ought to have been stated.

■ One of plaintiff's more puzzling allegations is that defendants failed to disclose in the proxy material that the $5.50 exercise price was an arbitrary figure selected without consideration of the book value of each share, and that if book value had been considered the exercise price would have been higher. Plaintiff has offered us nothing beyond his bare assertion that would lead us to believe that the exercise price is "arbitrary" rather than "negotiated", as the proxy statement says it is. His suggestion that book value is any indication of the real value of shares of stock has long been discredited, and should not have been resurrected for the purposes of this proxy solicitation.[5]

In his complaint, plaintiff makes several allegations which charge that the proxy material violates § 14(a) because it fails to disclose the extent and nature of the opposition to the New Plan of Refinancing. He claims that the proxy material misstates or omits (1) plaintiff's reasons for opposing the proposal; (2) the opposition of the Trustee of the New Haven Railroad to the plan; and (3) the Order issued on August 15, 1972 by Judge Robert P. Anderson of the New Haven reorganization court which instructed the New Haven Trustee to vote against the New Plan and to recommend that the Penn Central Company immediately petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq.

Plaintiff has offered no proof as to when or in what manner he expressed his opposition to the New Plan to the Board of Directors. We assume, however, that the Board was notified sometime between the mailing of the July 17 proxy statement and the preparation of the August 9 supplement.

Defendants do note Mr. Allen's opposition to the Plan in the supplement. Under the italicized heading of *Opposition of Nominee for Director to the Plan of Refinancing* they state that Mr. Allen is a substantial stockholder and a management nominee for election to the Board who "opposes and intends to vote *against* the Plan of Refinancing." [Emphasis in the supplement.] They also note that Mr. Allen had supported the plaintiffs in the litigation over the 1971 proxy material (Robinson v. Penn Central Company, *supra*).

■ It is undoubtedly true that Mr. Allen's opposition to the New Plan is a material fact which was properly stated in the proxy material. The opposition of a nominee for Director to the

5. "The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and, second, that liquidation values are a measure of present values. Every one knows that the value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light. When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible." Borg v. International Silver Co., 11 F.2d 147, 152 (C.A. 2, 1925) (Hand, J.). On July 7, 1972, the closing price of the Company's common stock on the New York Stock Exchange was $4.125. *See also*, Evans v. Armour & Co., 241 F.Supp. 705, 714 (E.D.Pa.1965).

plan, and especially that of one who has been nominated by the same management that has proposed adoption of the plan, is a matter of more than routine interest to the Company's shareholders. We are not convinced, however, that a statement of Mr. Allen's *reasons* for opposing the plan should have been included to satisfy § 14(a).[6] A management proxy statement must explain the proposal accurately and fully, but it need not be a forum for every possible disagreement with the proposed course of action. An avalanche of detailed argument of all positions may render the proxy statement so opaque as to be nearly incomprehensible. We therefore conclude that the Board did all that was necessary with respect to Mr. Allen's opposition.

■ The supplement's statement of the position of the New Haven Trustee is a substantially accurate explanation of the Trustee's position as of the time the supplement was sent to the shareholders. In the Trustee's petition to the New Haven reorganization court for instructions on what action to take on the New Plan of Refinancing, the Trustee expressed the opinion that appropriate proceedings should be instituted for adjudication of the validity of the Company's guarantee of the debt to the Noteholders. In the Matter of the New York, New Haven and Hartford Railroad Company, Debtor, Petition for Order No. 679 (D.C.Conn., Aug. 3, 1972). This position was stated in the supplement. The Trustee also set out seven alternative courses of action for him to take on the New Plan, including voting for the adoption of the Plan and voting against it. *Id.* It would have been unwise and misleading for the Board of Directors to have tried in the proxy statement to speculate further on the New Haven's position.

■ The more important question is what defendants should have done after they learned of Judge Anderson's Order

No. 679 of August 15. Plaintiff argues that this Order, because it instructed the Trustee to vote against the Plan and expressed a distinguished judge's opinion that immediate reorganization would be preferable to the New Plan, was of such importance that defendants should have further supplemented the proxy statement.

■ The Estate of the New Haven, with 4% of the outstanding common stock, is the Company's single largest shareholder. The intention of one stockholder, no matter how substantial his interest may be, would ordinarily not be a material fact for the purposes of § 14(a). However, the New Haven's decision was the result of a court order by a distinguished judge who had carefully examined the New Plan and the overall position of the Company. Because of this we think the August 15 Order should normally have been brought to the shareholders' attention and that its omission had a "significant *propensity* to affect the voting process." Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. at 384, 90 S.Ct. at 621.

Defendants argue that they would have included some reference to Judge Anderson's Order had it not been issued on a Friday only nine days before the Annual Meeting was to take place. We do not, however, regard the expense and inconvenience of further supplementing the proxy statement as a complete justification for defendants' failure to do so.

■ Nevertheless, the remedy for the omission of a material fact must vary with the circumstances.

"We assume that Rule 14a–9 may be read as authorizing a court to require a further statement and an opportunity to revoke proxies where a proxy statement, correct at the time of its issuance, has become misleading as a result of subsequent developments [citation omitted], although the words of the Rule are not exactly apt to that

---

6. This is assuming, again, that Mr. Allen's reasons were in fact disclosed to the Board of Directors.

end. But this is strong medicine * * * and a correspondingly strong showing of materiality is required." General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 163 (C.A.2, 1968), cert. denied 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

■ Plaintiff filed his complaint two days before the Annual Meeting. He does not ask us to order that a new supplement be issued and proxies be resolicited. Rather, he asks us to appoint a special receiver for the Company with limited powers and requests, in effect, that we take over the management of the Company for the immediate future. We regard this as very "strong medicine" indeed, too strong to be warranted by the proxy material before us.

The Plan of Refinancing which the proxy statement and supplement describe is not a simple one. We doubt that it is humanly possible in a brief proxy statement to explain this transaction completely and, at the same time, in a manner which makes it comprehensible to the ordinary investor. Defendants have fallen short of perfection but we feel that they have described the plan and its probable consequences with fair accuracy and in a sufficiently direct manner. Whatever weaknesses there are in the presentation are due more to the inherent limitations of the art form than to deception on the part of defendants. We therefore hold that in the light of all the circumstances, defendants have not committed such a violation of § 14(a) and Rule 14a-9 as would justify the relief sought.

■ We also find no violation of § 10(b) of the 1934 Act and Rule 10b-5 thereunder. Plaintiff's allegations of § 10(b) violations consist of an alleged course of conduct on the part of defendants which has at its core the claim that defendants made false and misleading statements in the proxy material. It is readily apparent that if plaintiff has failed to prove the elements of a § 14(a) violation, *a fortiori* he is unable to prove a violation of § 10(b) on the same facts. An allegation of fraud which consists mainly of the charge that the proxy material was misleading will necessarily fail if the proxy material has been found not to be misleading. Richland v. Crandall, *supra,* 262 F.Supp. at 553. *See* Kohn v. American Metal Climax, Inc., *supra,* 458 F.2d at 269.

■ Plaintiff's claim that the New Plan constitutes waste under Pennsylvania law is virtually unsupported by argument or evidence. A court may not, at the request of a dissatisfied shareholder, substitute its judgment for that of management unless management has in some way breached its fiduciary duty to the corporation. Miller v. American Telephone & Telegraph Corp., 344 F. Supp. 344, 349 (E.D.Pa.1972); Chambers v. Beaver-Advance Corp., 392 Pa. 481, 489, 140 A.2d 808 (1958). This is especially true where, as here, management's decision has been ratified by a majority of the shareholders. Smith v. Brown-Borhek Co., 414 Pa. 325, 200 A.2d 398 (1964). We do not regard management's decision to enter into the New Plan of Refinancing as so reckless and imprudent as to justify a finding that the officers and directors have wasted the Company's assets.

The foregoing shall constitute the court's findings of fact and conclusions of law.