Sylvia RICHLAND, M. Klastorin, Morris Millimet and Anne Fagen, Plaintiffs,

v.

Lou R. CRANDALL et al., Defendants.

Nos. 65 Civ. 1625, 65 Civ. 1658, 65 Civ. 1678, 65 Civ. 2020.

United States District Court
S. D. New York.

Jan. 13, 1967.

See also D.C., 259 F.Supp. 274.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff Sylvia Richland, Paul L. Ross, and Lois Regent Sivin, New York City, of counsel.

Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff M. Klastorin, Stanley L. Kaufman, New York City, of counsel.

Kramer, Bandler & Labaton, New York City, for plaintiff Morris Millimet, Edward Labaton, and Sidney Kramer, New York City, of counsel.

Milberg & Levy, New York City, for plaintiff Ann Fagen, Irving Steinman, New York City, of counsel.

Kramer, Marx, Greenlee & Backus, New York City, for defendant George A. Fuller Co., John J. Hayes, and Norwood P. Beveridge, Jr., New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants BCLM, Inc., Cloyce K. Box and William V. Lawson, John F. Arning, and Cornelius B. Prior, Jr., New York City, of counsel.

Casey, Lane & Mittendorf, New York City, for defendants Edwin J. Beinecke and others, Samuel M. Lane, and John Holbrook, New York City, of counsel.

White & Case, New York City, for defendants Lou R. Crandall and others, Paul Bschorr, and John M. Johnston, New York City, of counsel.

## OPINION

MANSFIELD, District Judge.

This lawsuit arises out of dissatisfaction on the part of four (out of more than 1,300) stockholders of the George A. Fuller Company of New Jersey ("Fuller" herein), who own approximately $\frac{1}{10}$th of 1% of its issued stock, with the decision of fellow-stockholders, who own 70.6%, to sell its business as a going concern and liquidate the corporation in accordance with the law of its state of incorporation (New Jersey) which permits such sale and liquidation upon approval by $66\frac{2}{3}\%$ of the issued shares. N.J. Stat.Ann. 14:3-5 (1939). On June 30, 1965 its business was sold to BCLM, Inc., a Maryland corporation, for $15,917,370 (or $37 per share) plus certain possible tax adjustments, pursuant to approval by Fuller's Board on April 6, 1965 and more than two-thirds of its stockholders on June 7, 1965.[1]

---

1. The figure approved by Fuller's stockholders on June 7, 1965 was $15,885,728, which was increased on the closing date to $15,917,370. In addition, substantial payments reflecting tax refunds (for which application has been made to the Government) remain to be paid.

In May and June 1965, before the sale, the four dissatisfied plaintiffs launched their attacks in separate suits against Fuller's directors, principal officers, and BCLM, Inc., claiming violations of the Securities Exchange Act. After denial of preliminary injunctive relief on June 4, 1965 (see Richland v. Crandall, 353 F.2d 183 (2d Cir. 1965); Klastorin v. Roth, 353 F.2d 182 (2d Cir. 1965)), plaintiffs on November 15, 1965 filed a consolidated complaint asserting that they sued derivatively, individually, and on behalf of all Fuller stockholders as a class, for rescission of the sale and for damages. The gravamen of the lengthy and prolix complaint is the claim that the officers and directors obtained stockholder approval through false proxy material in violation of § 10(b) (15 U.S.C. § 78j(b) (1964)) and § 14(a) (15 U.S.C. § 78n(a) (1964)) of the Securities Exchange Act.[2] Jurisdiction was asserted under § 27 of the Securities Exchange Act (15 U.S.C. § 78aa (1964)). In addition, "on the doctrine of pendent jurisdiction", plaintiffs alleged that Fuller's directors and officers had been guilty of breach of fiduciary duty to the corporation and its stockholders.[3]

After extensive pretrial depositions, most of them before Judge Henry N. Graven, then sitting by designation, plaintiffs' demand for a jury trial was sustained with respect to their individual and class action claims for damages under the Securities Exchange Act as "Suits at common law" within the meaning of the Seventh Amendment (see Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962)), even though joined with equitable claims. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). A jury trial was denied as to the balance of the claims for the reason that being equitable they did not qualify as "Suits at common law".[4] (See 259 F.Supp. 274.)

2. 15 U.S.C. § 78j(b) (1964):

"It shall be unlawful for any person,

* * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78n(a) (1964):

"(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

3. The consolidated complaint on its face appears to be limited to a claim (brought both derivatively and individually) under §§ 10(b) and 14(a) of the Securities Exchange Act, and does not purport to state any separate claim for breach of fiduciary duty. Although some allegations charge that certain conduct of the defendants constituted a violation of their fiduciary obligations to the stockholders, they are so intermingled with the Securities Exchange Act claim that they appear at first to be a mere prelude to the latter. Shortly before trial, however, plaintiffs' counsel advised the Court that the complaint was intended to state a separate claim for breach of fiduciary duty based on the charge that the defendant-directors of Fuller were guilty of "constructive" fraud in selling the company's assets for a grossly inadequate consideration, in failing to continue the corporation in business, and in obtaining from BCLM, Inc., the purchaser, an indemnity following institution of the present litigation but after the sale had been approved by the Board and the stockholders.

4. Upon argument of defendants' motion to strike plaintiffs' demand for a jury trial, plaintiffs' counsel, while urging that the alleged violations of the Securities Exchange Act could be the subject of an individual and class action (relying upon J. I. Case Co. v. Borak, supra), did not contend that a claim was stated against the Fuller directors for breach of fiduciary duty which could be the subject of

The case was then tried to a jury pursuant to a stipulation that the record would constitute the record of the non-jury trial for purposes of resolving the latter claims, together with certain additional evidence received by the Court pertaining solely to the equitable claims. It is these latter claims that are the subject of this opinion, which will serve both as findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.

After a series of pretrial hearings directed principally to simplification of the issues, stipulations of fact, housekeeping matters (including premarking of hundreds of exhibits) and evidentiary rulings, the individual and class action issues were tried to a jury from November 17, 1966, to December 9, 1966.[5] In answer to interrogatories, the jury found that the price paid for the Fuller assets and business was not grossly inadequate (as claimed by plaintiffs) and that there was no material misstatement of fact, or omission of a material fact, in the proxy statement used to solicit stockholder approval. Thereupon the jury rendered a verdict for the defendants.

There remain for consideration the pendent jurisdiction and derivative claims tried to the Court. After reviewing the evidence, the Court accepts and adopts the jury's answers to interrogatories and finds for the defendants.

A preliminary review of some background facts is essential. For many years prior to the events in question, Fuller was one of the country's leading construction companies. It had built many outstanding structures (monuments, office buildings, banks, plants, hospitals and the like, including Lincoln Memorial, United Nations building, and the new Metropolitan Opera House in New York City). Its principal business had been such construction, which was essentially a service type of operation involving employment of large numbers of people in connection with obtaining and carrying out construction jobs. In addition to its construction business, it had in recent years also invested in some other assets related to construction. It owned a substantial stock interest in the Oklahoma Cement Company, for which it had completed a cement plant in 1962. Oklahoma Cement made and sold cement and related supplies, its business depending in part on orders received from Fuller and its subcontractors for cement used on their many construction jobs. Fuller also owned partial equity interests in several real estate ventures, including some buildings under construction by it (330 Madison Avenue, New York City; the Brunswick Building, Chicago; the Wilson Park Apartments, Santa Monica; 550 Broad Street, Newark (the construction of which had just begun in the spring of 1965)), and stock in a land development project called Mission Viejo, Orange County, California.

Fuller was managed by its Chairman of the Board, Lou R. Crandall, who was also its Chief Executive Officer; a 16-man Board of Directors, of which 8 were outside directors and 8 were officers of Fuller; and its President, William V.

a class action. After the Court's decision on the jury trial question and during the course of the trial, plaintiffs asserted that they were entitled to a jury trial of their breach of fiduciary duty claim on the ground that it could properly be the subject of plaintiffs' individual and class action. This application was denied for the reason that the breach of fiduciary duty claim, more fully described below, was assertable only derivatively on behalf of the corporation and did not assert a right resting primarily in the stockholders. Gordon v. Elliman, 306 N.Y. 456, 119 N.E.2d 331 (1954); Berzin v. Litton Industries, Inc., 24 A.D.2d 740, 263 N.Y.

S.2d 485 (1st Dept.1965); Major v. American Malt and Grain Co., 110 Misc. 132, 181 N.Y.S. 152 (Sup.Ct.1920); Mayer v. Oxidation Products Co., 110 N.J. Eq. 141, 159 A. 377 (Ch.1932); Fleisher v. West Jersey Securities Co., 84 N.J. Eq. 55, 92 A. 575 (Ch.1914). It therefore could only have been the subject of a suit in equity and not a "Suit at common law" under the Seventh Amendment.

5. Testimony of 28 witnesses, covering 2,-717 pages of transcript, and 127 exhibits, were introduced.

Lawson, and various vice presidents, under whom were its large staff of personnel in lower echelons. The company faced the problem that officers responsible for almost all of its profits were either on the verge of or past retirement age. Crandall was in his 70's. A key vice president in charge of the Chicago office had died suddenly, leaving no replacement. Four other vice presidents were near or past 65. Since Fuller was essentially a personal service type of enterprise, like a law firm or advertising agency, it depended on the ability of its officers to obtain construction business. In recent years its profits had declined. Although there were younger officers in the company, including William V. Lawson, Crandall's son-in-law, who had been elected president in 1964, they had not proven their ability to maintain the company's business.

In 1964 the defendant Cloyce K. Box, a Vice President and Director who had been responsible for the Oklahoma Cement project, attempted unsuccessfully to interest Winthrop Rockefeller and a wealthy Texas friend of the Rockefellers, Trammel Crow, in purchasing the company. Thereafter Box formed a group consisting of himself, Crow, Lawson and a company called Western Sales, Ltd., of which one Maurice Moore was the chief executive officer, for the purpose of attempting to purchase the company's business. They formed BCLM, Inc., and in January 1965 initiated negotiations with Crandall, who refused to talk price or take further steps (other than to insist upon continuation of Fuller's pension plan and retention of all employees as a unit as preliminary conditions) until the group could demonstrate that they had the cash and financing needed to consummate such a purchase, especially since news of any proposed sale could damage Fuller and its employees' morale if news leaked out and it proved abortive.

The purchasing group then sought and obtained a commitment from The Chase Manhattan Bank to loan $12,500,000 provided it had certain personal guarantees by Messrs. Box and Crow, a wealthy man;

a commitment from the New York Life Insurance Company for $3,500,000 of subordinated debt on various conditions, including a partial guarantee by the Marquette Cement Manufacturing Corp. The group also made plans for the capitalization of BCLM through sale of $3,000,000 of preferred stock and $1,000,000 of common stock, the latter to be raised by sale of a 25% interest to each of the four members of the purchasing group for $250,000 apiece. Box, acting for the purchasing group, obtained from the First Boston Corporation a written opinion, based on its study of the Fuller company, that a fair and reasonable price for Fuller's net assets and business would be $37 per share.

On March 12, 1965 the purchasing group advised Crandall that they were going to offer $37 a share for Fuller's business as a going concern, a price that was described as final, and on March 16 a formal written offer was submitted. One of the conditions was that Crandall serve for a transitory period as chairman and director of BCLM, to assure continuity in handling jobs in process and maintaining customer relations.

Crandall, who was thoroughly familiar with Fuller's assets and business, considered the offer a very fair one to Fuller and its stockholders. He desired to obtain the highest possible price for its stockholders, including himself. He, together with members of his immediate family, owned approximately 37,500 Fuller common shares. On the basis of his many years of experience with Fuller and his intimate knowledge of its assets and business, he believed that the company was not worth more than $37 per share, even after allowing a few dollars per share for good will and going concern value, and that it was unnecessary, and would be wasteful, for Fuller to obtain another appraisal. Fuller common stock then traded on the American Stock Exchange at prices ranging from $31 to $35.50 per share. During 1963 the stock had ranged from $30.50 to $36.50 per share, and in 1964 from $29 to $37.75 per share.

After receiving the offer Crandall consulted, either in person or by phone, with some of the company's key directors who, like himself, were owners of large amounts of Fuller stock and whose opinions, by reason of their expertise and experience, were considered by him to be entitled to considerable weight. Among these were E. J. Beinecke, former chairman of the Board of Fuller, who owned and controlled, either personally or through foundations and close members of his family, approximately 74,260 shares, or 17% of the outstanding common stock. Beinecke was an outstanding business executive, who, in addition to having been associated with the Fuller company for 60 years, was the head of the Sperry & Hutchinson Company and a member of boards of many different companies. Other directors consulted at an Executive Committee meeting were John S. Hilson, an investment banker, income beneficiary of trusts holding several thousand Fuller shares, and member of the banking firm of Wertheim & Co., clients of which owned approximately 50,000 shares; and Charles J. Stewart, former president of Manufacturers Trust Company. Both Hilson and Stewart were members of Fuller's Executive Committee. Crandall also had extensive discussions with Hugh E. Drayer, treasurer and chief financial officer of the company, who was elected a director in April 1965. All officers and directors consulted by Crandall considered the offer to be a fair one and recommended its acceptance, Beinecke even urging Crandall to take it and not risk losing it by trying to negotiate a higher price.

·Except for the foregoing discussions, the purchase offer was kept confidential until it was formally presented to the Board, since Crandall did not want to risk harm to the morale of Fuller employees that could result if the proposal were disclosed earlier and then not approved by the Board. On April 6, 1965, the Board met to consider the proposal.

The meeting was attended by all members except E. J. Beinecke, who was ill, and Crandall, Box and Lawson. Since Box and Lawson were members of the purchasing group, and the proposal contemplated that Crandall would become a director and chairman of BCLM for a transitory period,[6] these three absented themselves. Also attending the meeting were Fuller's Treasurer and Chief Financial Officer, Hugh E. Drayer, and its legal counsel, Henry M. Marx. Each member of the Board had before him a set of documents relating to the proposal, including the sales agreement with BC LM, a proposed form of proxy and proxy statements that might be used in connection with any stockholders' meeting called to consider the proposal, the First Boston Corporation opinion that a fair and reasonable price for the company's net assets would be $37 per share or $15,885,788, and various proposed agreements by members of the purchasing group indicating that they would invest $1,000,000 of their own money in BCLM, that they expected to obtain a $12,500,000 loan from The Chase Manhattan Bank, a $3,500,000 loan from the New York Life Insurance Company, and an investment of $3,000,000 in BCLM by Western Sales, Ltd.

After discussing the proposal for about two or three hours, the Board unanimously approved it, recommending it to its stockholders, and approved a notice of a special meeting of stockholders to consider the proposal, forms of proxy and proxy statement for use in connection with the meeting, and an authorization to the officers of the corporation and its counsel to call the special meeting.

Following the April 6 Board meeting, the company's counsel, on April 14, 1965, submitted the proposed notice of special meeting, proxy and proxy statement to the Securities Exchange Commission for approval or comment in accordance with Rule 14A–6(a) (17 C.F.R. § 240.14a–6 (1964)) of SEC Regulation X14. An ex-

6. Upon sale of Fuller's assets and business Crandall served as Chairman of the Board of BCLM (but not as its chief executive officer) until April, 1966. Neither Crandall nor his wife owned any interest in BCLM.

change of correspondence between the SEC and Fuller's counsel followed, resulting in a series of revisions suggested by the SEC, which were incorporated in the final draft of the notice and proxy statement. Various underlying documents were submitted to the SEC, including the First Boston Corporation's opinion letter of March 10, 1965.

At a May 17, 1965, meeting the Fuller Board approved the calling of a special meeting of stockholders for June 7, 1965, to consider the proposal and the proxy statement, recommending acceptance of the proposal, which was thereupon sent to the stockholders. On June 7, 1965, the special meeting of stockholders was held at the company's offices at Flemington, New Jersey, and 70.6% of the company's issued and outstanding stock entitled to vote voted in favor of the proposal. On June 30, 1965, the business and assets of the old Fuller company were sold to BC LM, Inc.

With this brief account of the main events leading up to the sale of the old Fuller company's business, we turn to the derivative claims tried to the Court: (1) That the defendants, in approving the sale and recommending it to the stockholders, violated their fiduciary obligations to the corporation and its stockholders; and (2) That the defendants obtained the approval of the stockholders through use of a proxy statement that violated the corporation's rights under §§ 10(b) and 14(a) of the Securities Exchange Act.

## THE CLAIMS OF BREACH OF FIDUCIARY DUTY

The first of these claims—the charge that the defendants were guilty of a breach of fiduciary duty—is three-pronged, resting on plaintiffs' contentions (1) that the sale price was so grossly unfair, inequitable and inadequate, and so far below the true value of the assets and business of the company, that its approval by the defendant-directors constituted a fraud upon the corporation and its stockholders; (2) that the defendants owed a duty to continue

the corporation in business in the absence of a showing by them of necessity to discontinue; and (3) that the defendants owed a duty not to accept from the purchaser an indemnity that was conceived and entered into after the sale had been approved by the stockholders and after this litigation had been instituted.

Before considering the proof as to the claims of breach of fiduciary duty, reference to a few fundamental principles is important.

■■■ ·The defendant-directors owed an uncompromising duty, as fiduciaries, to protect the interests of the corporation and its stockholders and to exercise the same degree of care that an ordinary prudent man would exercise in his own behalf to insure that the proposed sale of Fuller's business and assets would be entirely fair to the stockholders and that the consideration to be received was adequate and equitable. Litwin v. Allen, 25 N.Y.S.2d 667 (Sup.Ct.1940); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928). Since the purchasing group included two officers and directors of Fuller, it was particularly essential that the directors be convinced that the transaction neither have the purpose nor the effect of favoring them at the expense of Fuller and its stockholders, even though the interest of Lawson and Box as purchasers and the fact that Crandall was to become a director and transitory chairman of the board of BCLM might be fully disclosed to the stockholders when their approval was solicited. Litwin v. Allen, supra. The stockholders had the right to demand and expect from the defendants a completely honest and undivided loyalty in the exercise of their judgment as to whether the transaction was in the stockholders' interest.

■■■ On the other hand, there was no mechanical legal requirement that each director devote a specific number of days, hours, or minutes to consideration of the transaction (as plaintiffs seem to suggest) provided the time spent and consideration given to the matter

was reasonable under all of the circumstances, taking into consideration the fact that two of the directors were members of the purchasing group. Certain directors, by reason of their intimate familiarity over many years of experience with Fuller's assets and business, could probably satisfy their obligations within a very short period of time. Others brought with them broad experience as financiers and businessmen which enabled them to size up this type of proposal and exercise mature judgment within a relatively short time, especially in view of their knowledge of the marketplace for such businesses. Still others, who had no expertise in such specialized aspects as taxes, accounting or the law, would of necessity be forced to rely with respect to such technical matters upon advice received from experts in such fields. The whole purpose of having such a variegated group as members of a board is to gain the benefit of their pooled experience, without expecting that each will apply identical talents and without requiring each to analyze every pertinent specialized document. Nor is there any mechanical legal requirement that the defendant-directors insist upon a certain type of appraisal or valuation in determining the fairness of an offer for the purchase of the company's assets and business, provided it appears that under all the circumstances they exercised reasonably prudent judgment in reaching their decision.

(a) *The claim of gross inadequacy of price.*

Plaintiffs allege, in support of their claim of breach of fiduciary duty, that the price was not only grossly inadequate, but that it represented the fruits of a scheme between Crandall, Lawson and Box to secure the company's business and assets for themselves at the expense of the other Fuller stockholders. The identical charges are asserted as one of the grounds for the claim that the proxy statement contained false statements in violation of the Securities Exchange Act, which was tried to the jury:

"10. In view of the fact that the corporation was a profitable and successful going concern, the purported 'reasons for sale' given in the proxy statement were false and misleading and designed to conceal the true purpose of the sale, which was solely to carry out the scheme and plan of the defendants Lawson, Box and Crandall, to enable the said defendants to acquire the benefit and value of the organized setup and the assets of the corporation as well as its going concern value and good will and in so doing to acquire the same for a price which was so grossly unfair, unjust and inequitable to Fuller and its stockholders as to constitute a fraud and to shock the conscience of the Court." (Complaint, Par. XV, subpar. 10, p. 31)

As plaintiffs concede (both in their complaint and request to charge), the term "grossly unfair, unjust and inequitable" or "grossly inadequate" does not refer to a price or consideration that might be simply less than the actual value of the property. It means, and was intended by the plaintiffs to mean, a price so far below the actual value of the property and so unconscionably and unreasonably low that it would shock the conscience.[7] Clark v. Freedman's Savings & Trust Co., 100 U.S. 149, 25 L.Ed. 573 (1879); Mandell v. Liebman, 303 N.Y. 88, 100 N.E.2d 149 (1951); In re Down-

---

7. On this subject plaintiffs' counsel requested the Court to charge the jury as follows:

"13. The plaintiffs have offered proof of their claim as to the true value of Fuller as a going business. They claim that the consideration paid by BCLM was grossly inadequate.

"I instruct you that a 'grossly inadequate consideration' does not mean simply less than the actual value of the business and assets of Fuller. It means a consideration so far short of the real value of the property as to shock a correct mind. Gross inadequacy of consideration, if it exists, is a badge of fraud * * *"

ham Co., 5 W.W.Harr. 294, 35 Del. 294, 165 A. 152 (1932). Since the above-quoted claim was tried to the jury, the following interrogatory was put to it:

"Was the price to be paid for the assets and business of the George A. Fuller Company of New Jersey under the proposal submitted to its stockholders on June 7, 1965, grossly inadequate?"

to which the jury answered "No".

■■■■ The Court not only accepts the jury's finding but reaches the same conclusion on the basis of its independent examination of the evidence. The value of the assets and business of the old Fuller company as a going concern was the subject of voluminous proof at trial, including testimony of the defendants and several expert witnesses, comparisons with the value of other large construction businesses, analyses of the company's earnings and of the market price of its stock, expert appraisals and studies made for use in this lawsuit, evaluations of prospective profits on the backlog of construction contracts on the company's books at the time of the sale, financial records of the company and of the purchasing group (including balance sheets, operating statements, earnings projections, and the like) made in 1965 before the sale, and the contemporaneous evaluation of the business made in March 1965 by the First Boston Corporation at the instance of the purchasing group.[8]

After observing a dozen witnesses testify at length and carefully reviewing all of the proof, the Court finds that the price of $15,885,728, plus certain possible tax adjustments, was not grossly inade-quate, inequitable or unfair to the corporation or its stockholders, but that on the contrary, when the business and assets of the company are viewed as a going concern in the spring of 1965, the price and terms were fair and reasonable. It would serve no useful purpose to attempt here a detailed analysis of the mass of evidence on the subject of value. However, reference to some of the principal facts may be helpful. The Court was impressed not only with the trustworthiness and reliability of the testimony of the principal defendants and the expert witnesses Swensen, O'Keefe, Udall and Abelmann, but also by the soundness and accuracy of the data and evaluation methods used by them. In their overall evaluation of Fuller as a going concern, these defendants and Mr. Swensen of the First Boston Corporation emphasized the past market performance of Fuller common stock on the American Stock Exchange, where it was traded, as a prime indicator of the value of the business as a going concern. The price of $37 per share recommended by Fuller's management represented a premium over the then current market price of approximately $34.75 per share. For several years prior to the proposal here under review the stock had usually sold below $37 per share, its low point in the first quarter of 1965 being $31 per share, and its monthly average market price had remained below $37 per share since early 1962. The market price was not separable from the value of the business as a going concern, since it represented what willing buyers and sellers had negotiated repeatedly as the price for a proportionate share of the company's equity, includ-

---

8. Evidence of events subsequent to the sale was not admitted as proof of the value of the Fuller assets at the time of sale, except in two limited situations. The first was as confirmation of judgments made at the time of sale about anticipated losses on specific Fuller projects. These judgments were integral to computing the value of Fuller at the time of sale, and the Court found it desirable to have as much light as possible shed on the soundness of them. See Hickey v. United States, 208 F.2d 269, 277 (3d Cir. 1953), cert. denied, 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074 (1954), United States v. Brooklyn Union Gas Co., 168 F.2d 391, 397 (2d Cir. 1948). Such proof was limited to the results of factors that were identified as being operative at the time of the sale. The second exception was made when plaintiffs introduced evidence of events subsequent to the sale. Defendants were then allowed to go into related post-sale matters necessary to placing the events brought out by plaintiffs in perspective.

ing its good will, after having had available its annual reports, operating statements and other published data as to its operations. Although the stock of the company was traded lightly on the American Stock Exchange, it was traded regularly and it had not been subject to any artificially depressing or inflationary pressures, such as offers of or bids for large blocks.

In reaching their conclusion that the Fuller stock was not worth more than $37 per share, the defendants and Swensen also gave weight to other factors, tested in the world of finance. The book value of Fuller's net worth, even after making adjustments to reflect the market price of securities owned by it, was substantially below the $37 per share figure. The company's earnings trend had been downward since 1959. A comparison of its earnings with those of other large construction companies, and use of earnings multiples that were fair and reasonable under the circumstances, confirmed the fact that the market price was a fair indication of actual value. An asset analysis made by the First Boston Corporation indicated a liquidation value of $34.57 per share. It is significant that after making their analysis of the company in late February and early March 1965, the five members of the internal committee of the First Boston Corporation who had participated in its study (including some of its top officers) took a secret vote in which each independently wrote down his opinion of the value of the Fuller business on a per share basis and their opinions all fell within a range from $35.50 per share to $37.50 per share, only one of them being above $37 per share.[9]

In contrast to the foregoing methods, the plaintiffs and their expert, Martin J. Whitman, relied upon methods which,

while ingenious and imaginative, were speculative. Foremost among these was the procedure of capitalizing heavily on mere possibilities of future profits, usually on the assumption that the projected activity would be profitable, even though there were predictions in the first part of 1965 that some such operations would result in losses, which were later confirmed.

An example of the boot-strap type of projection indulged in by the plaintiffs is found in the $3,000,000 value placed by their expert on Fuller's mere opportunity to go into the insurance business, even though the opportunity had been rejected by Fuller's management, principally on the ground that it would cause the company to lose construction business with insurance company customers such as the Travelers Insurance Company, from which it had obtained large contracts in the past. Plaintiffs' expert also valued the good will of the company at $5,400,000, despite the personal service nature of the construction business and the fact that Fuller's profits were attributed almost entirely to officers who by reason of their age would shortly be retiring and leaving the company's service. The risky nature of the construction business, which appears to have been disregarded by plaintiffs, is illustrated by the fact that although some of Fuller's officers projected gross earnings of almost $9,500,000 on its $256,000,000 backlog in construction contracts in the spring of 1965 (or a net profit of approximately $1 or $2 million, after overhead, operational costs and taxes), it became apparent, as the spring of 1965 progressed (and before the sale of Fuller's business was consummated) that heavy losses on certain projects (including the Oroville project in Los Angeles) might wipe out such profits entirely. In fact these fears were realized when the company suffered a

9. Although plaintiffs attacked the First Boston opinion on the ground that the amount of its compensation was to depend on whether the letter was found useful and the extent to which it was used, this was a customary fee arrangement in such matters, and none of the

purchasing group suggested to First Boston what price the purchasers wished to pay, or asked it for its opinion as to the "minimum" price. The request was for its opinion as to the "fair" price, and its opinion letter so states.

loss of $1,600,000 on its construction business for the first six months of 1965. Plaintiffs, however, ignore such confirmed risks in their figuring.

Plaintiffs would also inflate Fuller's principal tangible assets substantially beyond their actual value by understating or underestimating many costs and overstating and overestimating income items. After reviewing the proof, including appraisals and expert testimony offered by both sides, and projections made in the spring of 1965, including those that were optimistic, the Court finds that in the spring of 1965 Fuller's investments in the Brunswick Building, 330 Madison Avenue, Wilson Park (also known as Edgewater Towers) were not worth the amounts suggested by plaintiffs and their experts, but that on the contrary Fuller could reasonably expect losses on these ventures, some of which were later confirmed when the Brunswick Building was sold at a $350,000 loss, and Wilson Park was operated at a substantial loss annually. Wilson Park was written down by $1,600,000 when BCLM acquired it. Although plaintiffs' and defendants' real estate appraisal experts (MacRossie and O'Keefe, respectively) used the same fundamental principle in valuing 330 Madison Avenue (i. e., capitalization of prospective earnings), O'Keefe's computation of income was more reliable and accurate, being based on a more thorough analysis of income and expense items, including rentals, costs and taxes.

With respect to Fuller's investment in Oklahoma Cement stock, the value of which at market prices based on limited trading was $3,422,124 in early 1965, it was unlikely that Fuller could sell the stock for such an amount.[10] The cement industry, which currently was experiencing an economic relapse, did not then present itself as an attractive business. Oklahoma Cement depended in substantial part on business from Fuller which might not continue after sale of the stock, and the offering of such a large block, representing 20% of Oklahoma Cement's issued shares, could depress the price in such a thin market.

In arriving at their inflated evaluation of the Fuller business, plaintiffs also contend that the liability of $1,225,000 carried on Fuller's consolidated balance sheet on December 31, 1964, for "deferred federal income taxes" should not have been deducted in computing the net value of Fuller's assets, for the reason that Fuller, in a liquidation under § 337 of the Internal Revenue Code, would not be required to pay this tax. Quite aside from the fact that even if this item were eliminated, the book value of the Fuller stock was still substantially below the purchase price of $37 per share, Fuller's balance sheet did not show a liability in the sum of $1,232,000 that the purchaser would assume if it were to accept responsibility for past service benefits payable under the company's pension plan to employees who would be continued as part of the going concern to be taken over by BCLM. The latter item, therefore, more than offsets the deferred federal income tax that might be eliminated from Fuller's balance sheet when it ceased to be a going concern.

Plaintiffs also claim that the alleged gross inadequacy of the price is shown by the purchasing group's ability to raise a total of $19,000,000 to finance the purchase for approximately $16,000,000. Each of the financing commitments, however, was obtained on the basis of guarantees by wealthy members of the purchasing group or their business associates who were apparently willing to gamble on the hope that they could make a success out of the new venture, including Trammel Crow, a wealthy Texan who was one of the co-venturers in the purchasing group, the Marquette Cement Company, and Highway Insurance Company, A. G., which deposited $2,000,000 worth of securities as collateral for the loan used to purchase BCLM's preferred stock.[11]

10. A block of 1,000 shares of preferred sold below market in 1965.

11. In plaintiffs' Ex. 63 reference was made to the fact that Crow, Box and Lawson had a combined net worth of $11,000,000.

(b) *The claim that defendants were obligated to continue Fuller in business.*

 In the absence of any legislative mandate, a plausible argument might be made for the proposition that where a corporation has operated profitably (albeit in a declining profit trend), its stockholders have the right to its continued existence and operation, at least until it begins to suffer losses or some major catastrophe. See Abbott v. American Hard Rubber Co., 33 Barb. 578 (1861); People v. Ballard, 134 N.Y. 269, 32 N.E. 54 (1892). But the corporation, as a legal vehicle of the Industrial Revolution, has gone through a statutory evolution that regards such philosophy as having disappeared with passage of the horse and buggy age. As Fuller was a creature of New Jersey law, the rights of its stockholders to dissolve or transfer its assets are governed by such law, except to the extent that they were modified by New York law as a condition to Fuller's doing business in the State of New York. § 1317 New York Business Corp.Law, McKinney's Consol.Laws, c. 4. (1963); German-American Coffee Co. v. Diehl, 216 N.Y. 57, 109 N.E. 875 (1915). Any right that stockholders might have possessed at common law to force continued existence of a corporation such as Fuller has long since been repealed by legislative grant of broad discretion to corporate management to sell and liquidate the company, provided the proposal is approved by a requisite percentage of the issued and outstanding stock. Fuller was authorized by the law of both New Jersey and New York to sell its assets upon approval by a two-thirds vote of the issued and outstanding stock. § 14:-3–5, N.J.Stat.Ann.; §§ 909 and 1001, N.Y. Business Corp. Law. Thus Fuller's directors had no duty to continue the corporation in operation or existence when, in their opinion, to do so would not be expedient. The decision made by the stockholders will not be disturbed in the absence of proof of fraud or that less than the requisite two-thirds majority had voted in favor of the sale or dissolution. See Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148 (1919); Light v. National Dyeing and Printing Co., 140 N.J.Eq. 506, 55 A.2d 233 (Ch. 1947).

 The Court finds that under the circumstances there was no need to show a necessity to sell Fuller's business and there was no breach of any obligation to continue Fuller in business.

(c) *The claims based on the indemnity agreement.*

 On June 28, 1965, long after the proposed sale of Fuller's business and assets to BCLM had been approved by its Board and by 70.6% of its issued stock, and after preliminary injunctive relief had been denied, Fuller and its directors, having been named as defendants in the present litigation, entered into an agreement with BCLM, Inc. to the effect that it would indemnify them against any liability arising out of the litigation if they should consummate the sale. On June 30, 1965, the sale was then consummated in accordance with the agreement as approved by the defendants and Fuller's stockholders.

The indemnity agreement of June 28, 1965, did not in any way reduce or change the consideration to be received by Fuller's stockholders pursuant to the agreement approved by them, which remained at $37 per share plus possible tax refunds, and the agreed upon payment was made by BCLM to Fuller when the sales agreement was consummated. The purpose and effect of the indemnity agreement was, therefore, not to change the rights of the corporation or its stockholders in any way, but to protect the defendants against the expense and risks inherent in such a lawsuit, baseless as the defendants believed it to be. There is no evidence indicating that the defendants would not eventually have performed the sale agreement in accordance with its terms, whether or not they obtained an indemnity.

Plaintiffs offer no logical basis for their claim that the indemnity agreement represented a breach of trust on the part

of the defendants. At the jury trial of plaintiffs' class action claim that there were materially false statements or omissions in the proxy statement, the Court excluded the indemnity agreement from the jury's consideration for the reason that the indemnity agreement was neither contemplated nor negotiated until after the proxy statement was sent to the stockholders and until after they had voted to approve the sale, and it was therefore irrelevant. Its admission before the jury would have been as prejudicial as would evidence of defendants' insurance coverage in a personal injury suit. Upon exclusion of the indemnity plaintiffs during trial moved to amend their complaint to allege that the indemnity agreement constituted an agreement to waive compliance with § 10(b) and § 14(a) of the Securities Exchange Act, and therefore violated § 29 (15 U.S.C. § 78cc (1964)) of that Act. This untimely motion to amend was denied for the reason that it failed to state a claim upon which relief could be granted, since the indemnity agreement was entered into *after* the alleged violations of § 10(b) and § 14(a) and did not obligate the defendants to waive compliance with those provisions. Furthermore, since a violation of § 29 would, on plaintiffs' own hypothesis, render the indemnity void and illegal, plaintiffs fail to show how it could cause the corporation or themselves any damage.

If the agreement had been contemplated or negotiated prior to the approval of the sale by the Board or the stockholders, it might be argued that the defendants were induced by it to disregard the interests of the stockholders. However, the proof is clear, and plaintiffs concede, that the indemnity was occasioned solely by the institution of the present litigation and that it was not negotiated until after the action of the Board and the stockholders. Under these circumstances the Court finds that the defendants' conduct in entering into the indemnity agreement did not constitute a breach of their fiduciary obligations to the corporation or its stockholders.

## THE CLAIMS OF ALLEGED VIOLATION OF §§ 10(b) AND 14(a) OF THE SECURITIES EXCHANGE ACT

Plaintiffs' §§ 10(b) and 14(a) claims are based entirely on alleged material misstatements in, or omissions from, the proxy statement approved by Fuller's Board and transmitted to the stockholders in advance of the June 7, 1965 meeting. Since the identical claims formed the basis of plaintiffs' individual and class action, which was tried to the jury, the Court presented to the jury the following Interrogatory:

"Did the Proxy Statement (Exhibit A) contain any statement which, at the time when it was made, was false or misleading with respect to any material fact, or which omitted to state any material fact necessary to make the statement not false or misleading?"

which the jury unanimously answered "No".

■ As a result of its own independent appraisal of the evidence with respect to each of some 18 items alleged to have been the subject of false, misleading or inadequate statements in the proxy statement, the Court has reached the same conclusion and accepts the jury's finding. Before proceeding to these specific items, however, a few general observations are essential.

■ The § 10(b) claim is apparently based on the theory that violation of § 14(a) may also constitute a violation of § 10(b) if accompanied by a purchase or sale of a security; that for purposes of their class action suit plaintiffs' surrender of their stock certificates to Fuller upon its liquidation following the sale of its business to BCLM constituted such a "sale" (see Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D. Del.1965)); and that for purposes of their derivative suit the sale of Fuller's holdings of Oklahoma Cement Company and Oceanarium, Inc. stock to BCLM also constituted such a "sale". Since § 14(a) deals specifically with deceptive proxy

material, it may well be that § 10(b) of the Act cannot be invoked by the plaintiffs. See Borak v. J. I. Case Co., 317 F.2d 838 (7th Cir. 1963), affd., 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); Barnett v. Anaconda Co., 238 F.Supp. 766, ¯76 (S.D.N.Y. 1965). The question appears to be academic in the present case not only because of the findings of the jury and Court but for the reason that the plaintiffs would in any event be required to prove all of the elements of a § 14(a) violation in order to make out a case under § 10(b).[12]

◼ In determining whether the proxy statement in the present case misstated or omitted any "material fact" as that term is used in the Securities Exchange Act and Regulations thereunder, the Court interprets the term to mean a fact which, if disclosed to the stockholders, would normally be expected to influence a reasonable stockholder in voting on the proposal for sale of Fuller's assets. The test to be applied in considering each of the alleged false, misleading and inadequate statements, therefore, is whether the fact claimed to have been misstated or omitted was of such a nature that it could normally be expected to lead a reasonable stockholder not to vote in favor of the proposal for the sale of Fuller's assets. Evans v. Armour & Co., 241 F.Supp. 705 (E.D.Pa.1965); Western Oils Fields, Inc. v. McKnab, 232 F. Supp. 162 (D.Colo.1964); Bresnick v.

Home Title and Guaranty Co., 175 F. Supp. 723 (S.D.N.Y.1959); Dunn v. Decca Records, 120 F.Supp. 1 (S.D.N.Y. 1954). Materiality is a matter to be determined upon all of the relevant facts and circumstances. United States v. Pope, 189 F.Supp. 12, 23 (S.D.N.Y.1960).

◼ Thus the defendant-directors were obligated to make a full and fair disclosure of those facts that a stockholder might reasonably need in order to make an intelligent decision with respect to the proposal. They were not required, however, to include in the proxy statement every single detail about Fuller and its operations that might be relevant to the proposal. If such were required, the data submitted to the stockholders would be so bulky and unwieldy, as is demonstrated by the voluminous exhibits here in evidence, that it might be more confusing than useful to the stockholders. Such a requirement could defeat the very purpose of the Securities Exchange Act itself and inhibit the consummation of business that might be of benefit to the stockholders. The defendants had some right to select from the mass of relevant material, provided they stated those facts that could reasonably be considered material, as distinguished from those that would normally be treated as insignificant, or as excessively detailed or cumulative.

◼ Some of plaintiffs' attack was directed toward the manner in which certain facts were expressed in the proxy statement. There is no requirement that a material fact be expressed in certain

12. The only difference in proof requirements would be that under the decisions in this Circuit plaintiffs, in a suit under § 10(b), must show an intent to defraud, or at least guilty knowledge on the part of the directors. O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964); Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Weber v. C.M.P. Corp., 242 F. Supp. 321 (S.D.N.Y.1965). Section 10 (b) uses language associated with an intent to defraud, i. e., "any manipulative or deceptive device or contrivance". Section 14(a) and SEC Regulation 14a–9 thereunder, however, does not contain any

such language. It outlaws use of any proxy statement that is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statement therein not false or misleading * * *." Accordingly the Court is of the view, and so charged the jury upon submitting to it the class action suit for deliberation, that plaintiffs were required only to prove that the defendants knew or should have known of the statements and material facts, and the Court refused to charge that an intent to defraud need be shown.

words or in a certain form of language. The language used and the position and emphasis given to each statement, however, may be considered in determining whether there has been a fair and candid disclosure of a material fact. However, corporations are not required to address their stockholders as if they were children in kindergarten.

Turning to the alleged misstatements and omissions, the complaint refers, in an indiscriminate, blunderbuss fashion, to numerous items, many of which are so co-mingled that it is difficult to consider each separately. There follows a reference to most of these items, which must of necessity be limited to highlights.[13]

(1) *The proxy statement's assertion that Crandall and Drayer, in consultation with the Beineckes and Hilson, negotiated the agreement on behalf of Fuller.* (Complaint Par. XV(1))

This statement was not false or misleading. Although the purchasing group, in making their offer to Crandall in mid-March 1965, stated that the price was final, the parties thereafter negotiated at length with respect to the price and terms (both before and after the Board meeting of April 6, 1965), principally with respect to an element of the purchase price that proved later to be substantial, the payment of a possible tax refund. Early contemporaneous projections indicated that there might only be a $200,000 tax carryback credit (based on an estimated loss of $400,000 for the period ending June 30, 1965). This credit was later revised upwards to $375,000 and Fuller's actual loss for the six months ending June 30, 1965 turned out to be $1,615,761, which would entitle Fuller to a refund of approximately $800,000.

Crandall did advise the Beineckes and Hilson of his negotiations. In addition Drayer conferred at length with Box with respect to the prospective deal and there were also negotiations with the purchasing group regarding its assumption of certain liabilities.

(2) *The allegation that the proxy statement failed to state that the purchasers were prepared to pay a greater price for the assets.* (Complaint Par. XV(1) (d))

The proxy statement could not in honesty have made the foregoing statement for the reason that it was not the fact.

Forty dollars per share had been mentioned by Mr. Klingenstein of Wertheim & Co. as a price that would be sufficient to "bring in" enough stock to control Fuller in a tender offer; and in a 1964 memorandum Box had used the same figure. However, the purchasing group was not prepared to offer this figure. When $40 was suggested by Crow (one of the purchasing group) to Crandall at a January 1965 conference between the purchasing group and Crandall, Box disclaimed the figure as an offering price and said that the matter would have to be explored further.

(3) *The assertion in the proxy statement that Fuller "did not obtain any real estate or other outside appraisal or reports".* (Complaint Par. XV(2))

This statement was neither false nor misleading. The purchasing group, not Fuller, had retained the First Boston Corporation to make a study and furnish its opinion as to what would be a fair price for the net assets of Fuller as a going concern. The First Boston report, dated March 10, 1965, was furnished by BCLM to Fuller when the purchase offer was made, and was considered by the Fuller Board at its April 6, 1965 meeting at which it approved acceptance of the proposal. The report advised that a price of $37 per share would be a fair and reasonable price, and the same price was recommended to the stockholders in the proxy statement. Thus, even if it be assumed that Fuller did "obtain" the First Boston Corporation's report (although it had in fact been obtained by BCLM), the

---

13. Although there was a complete failure of proof with respect to some items, plaintiffs' counsel refused to withdraw them when the case was submitted to the jury.

failure to include it with the proxy material was not a material omission. The central fact communicated by it, the fairness of the $37 per share price, was furnished to the stockholders in the proxy statement.

In addition to the First Boston Corporation report, Mr. Trammel Crow, one of the purchasing group, in the latter part of February and early March 1965 had obtained from an appraiser named Miller letters furnishing his opinion as to the possible value of Fuller's interest in certain real estate ventures. These letters were never furnished to Fuller's management other than to Messrs. Box and Drayer. They do not purport to be formal appraisals of the type later introduced at the trial. In some of them Mr. Miller indicated that his observations were "tentative" and that "if you want a more mature opinion, I will need additional information". With respect to Wilson Park and 330 Madison Avenue, the Miller letters tend to confirm the fact that Fuller's interest in these real estate ventures was not worth more than the value attributed to it in the balance sheet furnished to the stockholders in the proxy statement. Under the circumstances it might well have been misleading for the defendants to have included the Miller letters in the proxy statement furnished to the stockholders and the failure to include them did not constitute the omission of a material fact.

(4) *The proxy statement's assertion:*

" * * * Accordingly, the Board of Directors felt it incumbent upon itself, to determine whether or not the price offered therefor was fair and reasonable. * * * After consideration, the Board of Directors concluded that, on the basis of the price offered and the other terms of purchase, the acceptance of the offer would be beneficial to the stockholders and accordingly determined to accept the offer, subject to the approval of the stockholders, and to recommend to the stockholders that the offer be approved. * * *" (Complaint Par. XV(3))

The statement quoted above was not false or misleading. It did not imply, as plaintiffs urge, that Crandall, Box and Lawson had participated in the Board's approval of the proposed sale and in recommending it to the stockholders. Elsewhere the statement made it clear that these three directors did not attend the April 6, 1965 Board meeting at which the proposal was approved. They quite properly did not do so for the obvious reason that each was or would be connected with BCLM, the purchaser (Crandall as Chairman of its Board, and Lawson and Box as officers and owners of a substantial interest). Although they remained available in the building to furnish any information requested by the Board, the remaining 13 Board members considered the proposal independently. Crandall had already furnished information about the proposal to the key Board members and the Board did not make any further requests. In addition Drayer, Fuller's treasurer and chief financial officer, who was intimately familiar with the company's assets and business as well as with the negotiations with BCLM (in which he had participated), was present at the Board meeting, as was Marx, the company's counsel, who had handled the legal aspects, including review and drafting of the proposed purchase agreement.

Plaintiffs also contend that the above-quoted statement erroneously implied that all of Fuller's directors had been informed of the offer over a substantial period prior to the time when the Board acted, whereas some of them were not advised until after the proposal had been put into final form on the evening before the Board meeting. A fair reading of the proxy statement does not reveal any such suggestion, except as to those directors actually participating in the negotiations, who of course knew of the proposal for a longer period. The failure to refer to the specific amount of advance notice or information, if any, that each director received before attending the April 6, 1965 meeting did not constitute

a material omission from the proxy statement.

(5) *The following assertion in the proxy statement:*

"In determining the fairness of the consideration offered, the directors considered the past earnings of the corporation and its prospects for the future, its competitive position and its recent construction contract experience, its assets and the market history of the stock." (Complaint Par. XV (4))

The quoted statement was not false or misleading. In attempting to prove the contrary, plaintiffs used the familiar, age-old tactic of fragmentizing Fuller's financial picture into its many components (e. g., specific real estate ventures, prospective profit on uncompleted construction contracts, deferred federal income taxes, good will, etc.) and then eliciting from most of the defendant-directors testimony that they did not discuss or consider each of these items separately at the April 6, 1965 Board meeting. The record is clear, however, that at the meeting they did consider at length the First Boston Corporation's report and the market history of Fuller stock, which reflected and took into consideration the company's entire financial state, including the items stressed by plaintiffs. In addition many directors, in recommending the sale, had either considered or discussed at least some of the specifics, as follows:

a. The prospect that Fuller would have difficulty competing for construction business, or would lose business, when its top executives shortly retired. (Murphy, Stewart, Roth, MacLellan)

b. The value of Fuller's real estate. (Murphy)

c. The company's last balance sheet and operating statement and the book value of its assets as certified by Arthur Andersen & Co. (Stewart, Murphy, Roth, E. J. Beinecke)

d. The company's dividend prospects. (Hilson)

e. The company's good will. (Hilson, Leithead, E. J. Beinecke)

f. The value of the company's holdings of Oklahoma Cement stock. (Roth, Hilson, E. J. Beinecke)

g. Whether the proposal would provide for the continued employment of Fuller's employees by BCLM. (W. Beinecke)

h. The fact that prospects for the construction industry were not bright. (Leithead)

i. The value of the company's uncompleted contracts. (E. J. Beinecke)

(6) *The following assertion in the proxy statement:*

"After consideration, the Board of Directors concluded that on the basis of the price offered, the acceptance of the offer would be beneficial to the stockholders * * *." (Complaint Par. XV(5))

The quoted statement was not false or misleading. It accurately stated the opinion of the Board of Directors.

(7) *The allegation that the proxy statement failed to disclose an exchange of letters dated April 1, 1965 and April 5, 1965 between Fuller and BCLM.* (Complaint Par. XV(7))

This allegation remains unproved. The correspondence was not introduced and there was no showing that it would have been material.

(8) *The claim that the proxy statement failed to disclose that the First Boston Corporation determined the consideration to be paid by BCLM and that no one determined the consideration for Fuller.* (Complaint Par. XV(8))

This allegation was not proved. BCLM, not the First Boston Corporation, determined the consideration to be offered by it. Fuller's management, Board and stockholders determined the consideration that Fuller would accept.

(9) *The allegation that the proxy statement failed to disclose that BCLM was borrowing all of the funds necessary to finance the acquisition.* (Complaint Par. XV(9))

The failure to disclose that BCLM had obtained financing from The Chase Manhattan Bank and others did not constitute an omission of a material fact from the proxy statement. The commitments obtained from The Chase Manhattan Bank, the New York Life Insurance Company, and the loan obtained by the Contractors General Insurance Agency making possible the purchase of $3,000,000 of BCLM preferred, were induced in part at least by various guarantees not available to Fuller, by the investment of $1,000,000 new capital by Messrs. Crow, Moore, Box and Lawson, and by the deposit of $2,000,000 in securities as collateral by Highway Insurance Company, A. G.

(10) *The allegation that the purported reasons given in the proxy statement for the sale were false and misleading because they were designed to conceal a scheme to acquire the assets for a grossly inadequate price.* (Complaint Par. XV (10))

There was a failure of proof of this allegation. The price has been found by the jury and Court not to be grossly inadequate.

(11) *The allegation that the consolidated balance sheet and financial statement in the proxy statement failed to disclose the current value of Fuller's assets.* (Complaint Par. XV(11))

For all of the reasons outlined above in considering the value of Fuller's assets and business, the balance sheet and financial statement, which were prepared in accordance with the requirements of the SEC and were certified to by Arthur Andersen & Co. as presenting fairly the financial position of the company and the results of its operations in conformity with generally accepted accounting principles, did not contain any material misstatements or omissions.

(12) *The failure of the proxy statement to state any value for the work in progress and the backlog of uncompleted construction contracts.* (Complaint Par. XV(12) (13))

The proxy statement revealed that on March 31, 1965, Fuller had a backlog of $256,460,091 in construction contracts, and noted that there had been a decline from 1962 to 1964 in the ratio of gross income on construction contracts to work executed on such contracts, due primarily to increased costs, intensified competition in the industry and less favorable profits. Under the circumstances, which were testified to at length by various officials of Fuller, this statement was not false or misleading. Although some projections had been made that indicated possible gross profits of $9,500,000 (before subtracting overhead, taxes and job organization) on this backlog, the estimates were at best speculative and Fuller officials testified that as losses on certain contracts (e. g., Oroville) became apparent in the spring of 1965, they reduced their estimates sharply. To have required Fuller to include such estimates in the proxy statement could have been grossly misleading,[14] especially since the company, during the first six months of operations in 1965, suffered a net loss of $1,615,761 before federal income taxes.

(13) *The allegation that the proxy statement failed to state any value for good will and going concern value.* (Complaint Par. XV(14))

The failure of the proxy statement to assign a certain dollar value to good will and going concern value did not constitute an omission of a material fact. Such value was at best speculative, since the business was essentially a personal service one that depended upon its ability to obtain profitable business in the future. The officials responsible for all of its profits were on the verge of or past retirement and would shortly leave the company. Its profits had been de-

14. In this connection it must also be borne in mind that a Note to SEC Regulation 14a–9 expressly states:

"The following are some examples of what, depending on particular facts and circumstances, may be misleading within the meaning of this section:

"(a) Predictions as to specific future market value, *earnings* or dividends." (Emphasis added)

clining and it suffered a serious loss during the first six months of 1965.

(14) *The allegation that the proxy statement misstated the true value of Fuller's holdings in Oklahoma Cement Company, Inc. and Oceanarium, Inc.* (Complaint Par. XV(15))

There is a complete failure of proof of this allegation. The proxy statement gave not only the original cost of Fuller's holdings in the above companies, but the quoted market value. Plaintiffs fail to sustain their contention that the size of Fuller's holdings in Oklahoma Cement represented a valuable asset, the existence of which should have been revealed to the stockholders. On the contrary the proof was that Fuller's holdings, even if combined with the holdings of the purchasing group, would not constitute a controlling block commanding a premium. It was not shown that there were any buyers willing to purchase Fuller's holdings as a block. There was expert testimony to the effect that if the block were offered by the open market, it would have depressed the market value of Oklahoma Cement stock. Since Oklahoma Cement Company depended substantially upon Fuller as a source of business through purchases of cement used on Fuller construction projects, a purchaser of its Oklahoma Cement stock might find that the company would no longer enjoy Fuller's patronage, since there were competing suppliers and the cement industry was not prospering at the time. Under the circumstances it was not only inappropriate but might have been misleading to advise Fuller stockholders that its holdings of Oklahoma Cement Company were worth more than the figure shown in the proxy statement. In addition to the fact that the amount involved is relatively small, similar considerations apply to the statement of the value of Fuller's holdings in Oceanarium, Inc.

(15) *The allegation that the proxy statement failed to show a necessity for the sale of Fuller's assets.* (Complaint Par. XV(16))

Since the corporation was authorized under the laws of New Jersey and New York (N.J.Stat.Ann. § 14:3–5; N.Y.Bus.Corp.Law § 909) to sell its assets and business upon approval of two-thirds of its outstanding shares, there was no obligation to show in the proxy statement that the sale was necessary (as distinguished from desirable or advisable) and the failure to make any such showing did not constitute a material omission. The sole requirement under the Securities Exchange Act was that the defendants disclose all material facts that would enable the stockholders to make an intelligent decision as to whether the proposed sale should be approved. Even though the corporation might have continued in business, the shareholders had the right to sell the business and liquidate it if they believed that such a sale was in their interest, and a dissatisfied stockholder had the right of appraisal which was described in the proxy statement.

(16) *The allegation that the proxy statement implied that Fuller was coerced into the sale by the threat that key management officials would not continue its business, and failed to disclose employment contracts with such officials.* (Complaint Par. XV (17))

The proxy statement does not pose the threat suggested by the plaintiffs. It expressly discloses that three key management officials are associated with BCLM, the proposed purchaser, namely, Lawson and Box, who had an ownership interest in BCLM, and Crandall, who was to serve as a director and chairman of the board of BCLM. Since Crandall was in his 70's and well past the retirement age, he was not obliged to remain with Fuller. While Box and Lawson had employment contracts obligating them to continue as employees of Fuller, these contracts would not have any material effect upon the question before the stockholders, which was whether the price of $37 per share represented a fair and reasonable price for the business as a going concern (including Box and Law-

son) and whether the stockholders wished to sell the business and assets of the corporation for such a price. There is no suggestion or threat in the proxy statement that if the stockholders should not decide to approve the proposed sale, the officials involved would leave Fuller's employ.

(17) *The allegation that the purpose of the sale was to gain an estate tax advantage for Crandall and the Beineckes.* (Complaint Par. XV(17))

There was a complete failure of proof of this allegation. Although Box testified that at one point the subject of estate taxes had been mentioned to Crandall and that Crandall had expressed some interest in the subject, there was no proof that Crandall or the Beineckes were motivated by such considerations.

(18) *The allegation that the proxy statement failed to disclose that Box, an officer and director of Fuller, had bargained for the purchaser and that Crandall, the future chairman of the purchaser's board and father-in-law of Lawson, had represented Fuller.* (Complaint Par. XV(18))

The proxy statement itself shows the baselessness of the above allegation. It discloses that "Mr. Cloyce K. Box negotiated the agreement on behalf of BCLM". It further discloses that the purchasing group includes the president of the corporation (Lawson) and devotes an entire section, headed "INTERESTS OF THE MANAGEMENT OF THE CORPORATION", to a disclosure of the interests of Lawson and Box in the purchasing group, their positions as officers and directors of Fuller, and the fact that Crandall, Chairman of the Board and a director of Fuller, had consented to serve as a director and chairman of the board of BCLM. Thus there was a complete disclosure of all material facts relating to the interests of the principal officers of Fuller in the purchaser and the fact that they had participated in the negotiations.

The issues in this case have been tried twice, once to the jury and once to the Court, 259 F.Supp. 274, with unfavorable

findings to the plaintiffs on both trials. Accordingly, the derivative claims will be dismissed and judgment entered in favor of the defendants.

So ordered.